Murphy, J.
The plaintiffs, United Technologies Corporation and several of its wholly owned subsidiaries and divisions (collectively, “UTC”), bring this action for contract damages and for a declaration of the rights and obligations of the parties under certain general liability insurance agreements with respect to the plaintiffs’ past, present, and future liabilities. UTC’s liabilities arise from environmental claims resulting from their manufacturing operations and hazardous waste disposal practices at one hundred and nineteen (119) sites across the United States.
This memorandum is the second decision issued by the court concerning this dispute. In August of 1993, the court issued “Memorandum I”[3] which discussed fifteen (15) sites, all located in New England, for which UTC sought insurance coverage for environmental contamination. In Memorandum I, the court discussed the history of the relationship between the parties and reviewed applicable state and federal law concerning the issues pertinent to this conflict.[4] Those discussions will only be repeated where necessary. This memorandum (Memorandum II) will examine the thirty-nine (39) sites to which Liberty Mutual has moved for summary judgment and to which UTC has offered opposition. In addition, this memorandum will respond to UTC’s assertion that the defendants’ motion for summary judgment should be denied because UTC has not had an adequate opportunity to conduct discovery. A later memorandum (Memorandum III), will discuss the sixty-two (62) sites for which Liberty Mutual moves for summary judgment and to which UTC offers no opposition.
I. BACKGROUND
UTC is a diversified corporation with business operations located throughout the United States. It is a broad-based designer and manufacturer of high-technology products operating approximately three hundred (300) plants and maintaining sales and service offices in fifty-seven (57) countries around the world.
UTC has incurred various environmental liabilities at many locations throughout the United States. In recent years, UTC has been notified by federal and numerous state environmental agencies that they may be liable as potentially responsible parties (PRP’s) for groundwater, surface water, and soil contamination at one hundred and nineteen (119) sites. UTC seeks coverage for cleanup, remediation, and other costs under the primary and excess insurance policies issued to them by the defendants. In particular, UTC seeks coverage from its primary insurer, the defendant Liberty Mutual Insurance Company (Liberty Mutual), which at various times from 1951 to 1985 issued commercial general liability insurance policies to UTC. However, all insurance policies issued by Liberty Mutual to UTC after 1970 included a pollution exclusion clause. The pollution exclusion clause limits insur- *198 anee coverage to contamination which is caused by a sudden and accidental event.
II. Principles of Summary Judgment
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where the party moving for summary judgment does not have the burden of proof at trial, this burden may be met either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. Pederson, 404 Mass. at 17.
“A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial and mandates the award of summary judgment.” Kourouvacilis, 410 Mass. at 711, citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
III. UTC Is Not Entitled To Additional Discovery
On October 12, 1990, the court entered a case management order which indefinitely stayed discovery on all non-New England sites. That stay remains effective. UTC contends that they cannot adequately respond to Liberty Mutual’s motion for summary judgment until the stay of discovery is lifted and formal discovery can progress. As to the majority of the sites discussed supra, the court does not agree.
The determination of whether a continuance is to be granted under Mass.R.Civ.P. 56(f), to the non-mov-ant, is purely a matter for the trial court’s discretion. Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 307-09 (1991); Blake Brothers Corp. v. Roche, 12 Mass.App. 556, 560 (1981). In making such a determination, the court may consider multiple factors, including whether the information purportedly sought to be developed was already available to the non-movant. Id.
This litigation began in 1987, when UTC filed a declaratory judgment action seeking insurance coverage for cleanup costs incurred after UTC was found responsible for the environmental contamination of the sites discussed supra In order to prevail, UTC must set forth facts which indicate that they are entitled to such coverage. However, most agreements between Liberty Mutual and UTC contain a pollution exclusion clause which bars insurance coverage for contamination unless the contamination was caused by a “sudden and accidental” event. Therefore, UTC is only entitled to coverage if they can establish that the pollution exclusion clause is inapplicable. The court assumes that UTC’s complaint is not frivolous and that when filed, UTC was aware of facts sufficient to indicate that they were entitled to coverage. Further, on November 13, 1990, UTC filed a Second Amended Complaint, which alleged:
Upon information and belief, the environmental contamination and personal injury for which UTC Plaintiffs are alleged to be responsible in connection with the underlying environmental claims either commenced prior to the time when the insurance policies at issue contained any so-called pollution exclusion, or were “sudden and accidental” within the meaning of any such exclusion, or otherwise were outside the scope of any so-called pollution exclusion purportedly applicable to such contamination and personal injury.
Plaintiffs’ Second Amended Complaint and Jury Demand, at para. 549. The court assumes that when this Second Amended Complaint was filed, UTC was privy to facts sufficient to support the allegations made.
In February of 1991, UTC informed the court that it was ready for trial on all sites and urged timely litigation. Now, more than three years later, UTC asserts that they cannot adequately respond to Liberty Mutual’s motion for summary judgment because they have not had a sufficient opportunity to conduct discovery.
UTC has repeatedly stated that the contamination of the sites was suddenly and accidentally caused. Yet, UTC now fails to assert facts sufficient to substantiate these allegations. UTC has had over five years to conduct informal discovery. At many sites, environmental authorities have investigated and determined the source of environmental contamination. UTC is privy to these records. Litigation concerning the cleanup of these sites has been extensive. UTC is privy to all records arising out of this litigation. Further, UTC owns several of the sites at issue. As the owner of sites in dispute, UTC is in possession of all information relevant to the determination of the cause of contamination. Finally, several sites that were once owned by UTC have since been sold to a third party. However, UTC continues to be contractually obligated to reme-diate environmental contamination at these sites and is privy to information concerning that contamination. In sum, the court finds UTC’s request for discovery at this time disingenuous.
Further, a party requesting a continuance of discovery under Rule 56(f)[5] must demonstrate that discovery will lead to facts which are reasonably expected to create a genuine issue of material fact. Once a party has identified specific facts which would be uncovered through discovery, the party must demonstrate some *199 plausible basis for the belief that such facts are reasonably likely to create a material issue. If the additional facts will be merely cumulative, immaterial, or not sufficiently probative to support a verdict for the non-moving party at trial, the court shall deny the request for a continuance and grant summary judgment. Patterson-Leitch Co. Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988); Patty Precision v. Brown & Sharpe Mfg., 742 F.2d 1260, 1264-65 (10th Cir. 1984). See generally, John F. Lapham, Summary Judgment Before the Completion of Discovery: a Proposed Revision of Federal Rule of Civil Procedure 56(f), 24 U.Mich.J.L.Ref. 253-88 (1991).
Controlling case law is clear. The “sudden and accidental” exception to the pollution exclusion clause should not apply under circumstances where contamination was caused by long accumulated, unattended, and unsegregated pollutants, and were caused by events not clearly beyond the long range reasonable expectations of the insured. Lumbermens Mut. Cas. Co. v. Belleville Industries Inc., 938 F.2d 1423, 1427 (1st Cir. 1991), cert. denied, 112 S.Ct. 969 (1992). Once there is established a substantial, unbroken causal chain originating from a non-sudden and non-accidental polluting event which resulted in property damage, the pollution exclusion clause cannot be avoided merely by a showing that a single link along that chain constituted a “sudden and accidental” polluting event. Hussey Plastics Co., Inc. v. Continental Cas. Co., C.A. No. 90-13104-WD (D.Mass. 1993). A single sudden and accidental discharge “cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a ‘sudden and accidental’ occurrence.” Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. 330, 338 (1992).
Therefore, even if UTC discovered that a sudden and accidental event contributed to the environmental contamination at these sites, such facts would not be sufficient where pollution-prone operating practices are evident. The court will not perform a microanalysis of each possible source of contamination. Liberty Mutual has effectively demonstrated that most of the sites discussed supra were contaminated by pollution-prone operating practices. Therefore, the. pollution exclusion clause applies and bars coverage under the main body of the policies effective 10-1-70 and thereafter. This demonstration cannot be overcome even if UTC discovers that some of the contamination at a particular site may have been attributable to an accidental occurrence. Therefore, further discovery is pointless as to most sites. The Order of the court will explicitly state whether additional discovery regarding a particular site is necessary.
IV. The Essential Elements of UTC’s Claim
UTC seeks insurance coverage from Liberty Mutual for the costs incurred due to the environmental contamination of the sites discussed supra. Liberty Mutual moves for summary judgment. In order to prevail on their motion, Liberty Mutual must establish that it is unlikely that UTC will be able to establish the following essential elements at trial. First, contamination must have caused “damage” as defined within the insurance policies between UTC and Liberty Mutual. Second, the damage must have occurred to the property of a third party or pose an eminent threat to the property of a third party. The insurance agreements at issue excludes coverage for damage to UTC’s own property. Third, the third-party damage must have resulted in a lawsuit, or its equivalent. Fourth, the claim must have been made against a subsidiary of UTC for acts committed while that subsidiary was a “named insured” of UTC. Liberty Mutual is not obliged to provide insurance coverage for contamination caused by a subsidiary prior to that subsidiary’s acquisition by UTC. Fifth, for all contamination occurring after 1970, UTC must set forth facts which allege that the contamination was caused by a sudden and accidental event. If Liberty Mutual sets forth facts which establish that UTC is unlikely to satisfy any of these material elements at trial, then summary judgment in favor of Liberty Mutual is appropriate.
A. Contamination Must Have Caused Damage
1. Policy Language
In its CGL policies, Liberty Mutual agreed to pay on behalf of the insured all sums which the insured became legally obligated to pay as damages because of injury to or destruction of property accidentally caused.
2. Massachusetts Law
In Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689 (1990), the Supreme Judicial Court held that cleanup costs of contamination to the environment constitute damages within the meaning of the policy. However, the Hazen court distinguished response costs incurred for extant pollution, for which there was coverage, from costs Incurred to prevent future pollution, for which there was no coverage. Id. at 698, citing Aerojet-Gen. Corp. v. Superior Court, 211 Cal.App.3d 216, 237 (1989). The Hazen court held that damages do not include (1) the costs of complying with an injunction or governmental agency order directed to damage prevention, or (2) the costs of complying with the law when there has been no properly damage. Id. at 698.
Liberty Mutual is entitled to summary judgment if it can demonstrate that it is unlikely that UTC will be able to prove at trial that contamination resulted in damage.
B. Damage Must Be to a Third Party
1. Policy Language
Each Liberty Mutual policy issued from October 1960 through October 1, 1985, contains an exception to the insuring agreement as follows; “(T]his policy does not apply to injury or to destruction of property owned by any named insured.”
*200 2. Massachusetts Law.
The owned property exclusion will not bar coverage of cleanup costs undertaken on plaintiffs’ property where there is actual or threatened damage to third-party property, including contamination of the groundwater beneath the insured’s property. Where contamination of groundwater is limited to the property of the insured, there may be coverage for cleanup costs to prevent imminent harm or to mitigate harm to the property of another even in the absence of a third-party claim. See “Memorandum I” discussion. However, to the extent that all, or a portion of cleanup, relates solely to damage to an insured’s property and does not relate to prevention of off-site contamination, the owned property exclusion clearly applies, and such damage is not within the coverage provided. Hazen Paper v. United States Fidelity and Guar. Co., 407 Mass. 689, 698 (1990).
Liberty Mutual is entitled to summary judgment if it can demonstrate that it is unlikely that UTC will be able to prove at trial that contamination caused damage to a third party.
C. Third-Party Damage Must Result in a Suit
1. Policy Language
The language of the insurance agreement between UTC and Liberty Mutual obligates Liberty Mutual “to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of. . . injury to or destruction of property.” Under the terms of the policy, Liberty Mutual “shall defend any suit against the insured alleging such injury or destruction seeking damages on account thereof. . .”
2. Massachusetts Law
Massachusetts courts have held that a formal lawsuit, or governmental action equivalent to a lawsuit, will trigger an insurer’s duty to defend its insured. Governmental action is a “suit” when the consequences of the action are “substantially equivalent to the commencement of a lawsuit.” Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 696 (1990). Courts have usually required a showing that the action is adversarial or coercive, “making sufficiently clear that the force of the State will be brought promptly to bear in a way that threatens the insured with probable and imminent financial consequences.” Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 741 (1st Cir. 1990). In Hazen Paper, the court found that a “potentially responsible party” (PRP) letter from the United States Environmental Protection Agency (EPA) met the requirements of a suit. In the letter, the EPA demanded (1) immediate commitment to complete implementation of all cleanup measures and (2) reimbursement for costs incurred by the EPA and the Massachusetts Department of Environmental Protection (DEP). The PRP letter threatened criminal penalties and fines if Hazen Paper did not comply with the demands of environmental authorities. Hazen Paper, 407 Mass. at 694. According to the court, upon receipt of the PRP letter, Hazen Paper was forced to defend itself immediately, just as if it had been served with a complaint. The company faced inescapable financial responsibility because liability for pollution damage was not based upon fault. The risk to Hazen Paper was substantial, as liability was joint and several, and it could only increase if Hazen Paper did not respond immediately. The court noted the risk to the targets of governmental action from the likelihood that the action would “result in a dispositive, extrajudicial solution." Id. at 696-97.
Liberty Mutual is entitled to summary judgment if it can demonstrate that it is unlikely that UTC will be able to demonstrate at trial that damage to a third party has resulted in a suit or its equivalent.
D. No Coverage for a Subsidiary’s Pre-acquisition Activities
1. Policy Language
UTC seeks coverage from Liberty Mutual for the environmental liabilities of its subsidiaries and divisions under policies in place prior to UTC’s acquisition of these companies. Liberty Mutual issued policies to UTC, in which Liberty Mutual agreed to provide coverage to:
United Aircraft Corporation (former name of UTC) [and various specifically named divisions or subsidiaries of UTC] and any and all domestic companies, domestic corporations and other domestic business entities now or hereafter during the policy period owned, operated, controlled by or subsidiary to the aforementioned corporation or as interests appear, herein called the named insured.
2. Massachusetts Law
Under UTC’s interpretation of the policies, Liberty Mutual would be required to provide insurance coverage for environmental contamination caused by an entity prior to the acquisition of that entity by UTC. The plain language of the policies precludes such an interpretation.
The argument that the insured is entitled to indemnification for damages on account of property damage, even if the insured had no connection with the polluting entity when the damage occurred, has been considered and rejected by treatises and out-of-state cases. “Generally a policy will not be extended to cover liability of one who is not a party thereto and not contemplated with the risk.” 7A Appelman, Insurance Law and Practice, §§4491.01 at 2 (Supp. 1992); Maryland Casualty Co. v. W.R. Grace & Co., 794 F.Supp. 1206, 1230-32 (S.D.N.Y. 1991). Recently the Supreme Judicial Court similarly held that:
“Named insured” has a clear and explicit meaning. It is the individual or entity who is listed on the declarations page.
Jacobs v. United States Fidelity & Guaranty Co., 417 Mass. 75, 78 (1994). See also Textron Inc. v. Aetna *201 Casualty and Surety Co. et al., 638 A.2d 537 (R.I. March 11, 1994), 1994 WL 75701 (no insurance coverage for a subsidiary’s pre-acquisition activities).
Liberty Mutual is entitled to summary judgment if it can demonstrate that all contamination caused by a subsidiary occurred before that subsidiary became a named insured of UTC.
E. The Pollution Exclusion Clause
1.Policy Language
After October 1, 1970, all relevant Liberty Mutual insurance policies contained a pollution exclusion clause which stated that the insurance coverage did not apply to injury to or destruction of property arising out of pollution or contamination due to “the discharge, dispersal, release, or escape of smoke, vapors, soot, heat fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental.” While damages caused by the sudden and accidental release of pollutants was covered in the main body of the CGL policies, specific endorsements (Endorsement 4) provided coverage for damage caused by gradual pollution up to an agreed-upon limit. If the contamination of a site occurred prior to 1970, then the pollution exclusion clause is inapplicable and Liberty Mutual may be obligated to provide insurance coverage if all other elements discussed infra, are satisfied.
2.Massachusetts Law
Where it is undisputed that contamination was caused after the 1970 implementation of the pollution exclusion, UTC must allege that a sudden and accidental release of hazardous substances was the cause of the contamination. If UTC does not allege that the contamination was caused by a sudden and accidental discharge, then Liberty Mutual is entitled to summary judgment. Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. 330, 338 (1992); Landauer, Inc. v. Liberty Mutual Ins. Co., 36 Mass.App. 177, 181-82 (1994).
If UTC does allege that the contamination was caused by a sudden and accidental release, then Liberty Mutual can prevail on summary judgment only if they set forth facts which indicate that it is unlikely that UTC will be able to prove their allegations at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacalis v. General Motors Corp., 410 Mass. 706, 716 (1991). Contamination should not be considered as being caused by a sudden and accidental event in circumstances where discharges consisted of long accumulated, unattended, and unsegregated pollutants and were caused by events not clearly beyond the long-range, reasonable expectations of the insured. Lumbermens Mut. Cas. Co. v. Belleville Industries, 938 F.2d 1423, 1427 (1st Cir. 1991), cert. denied, 112 S.Ct. 969 (1992). Under circumstances where contamination has been caused by both pollution-prone operations and a sudden and accidental event, the court will not perform a microa-nalysis of each possible cause of contamination. Id. Once there is established an unbroken causal chain originating from a substantial non-sudden and non-accidental polluting event, the pollution exclusion clause cannot be avoided merely by a showing that a single sudden and accidental polluting event did occur. Hussey Plastics Co., Inc. v. Continental Cas. Co., C.A. No. 90-13104-WD (D.Mass. 1993). A single sudden and accidental discharge “cannot contradict a, reasonable reading of the allegations that the entire pattern of conduct was not a ‘sudden and accidental’ occurrence.” Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. 330, 338 (1992).
If Liberty Mutual can set forth facts that establish that it is unlikely that UTC will be able to prove that the contamination at a site was caused by a sudden and accidental event, then summary judgment in favor of Liberty Mutual is appropriate. In such a circumstance, UTC’s only remedy would be to seek insurance coverage under Endorsement 4 which provides limited coverage for contamination caused by gradual pollution.
IV. Memorandum and Conclusion as to Summary Judgment on 39 Sites to Which UTC Offers Opposition
Liberty Mutual seeks summary judgment in regards to the following sites:
American Chemical Services, Griffith, IN 1-29
American Chemical Services, Inc. is a solvent reclaimer and chemical manufacturer located on fifty-two acres in Griffith, Indiana.
1. Site Operations. This solvent recycling site has been in operation since 1955. Affidavit of Gary S. Kull, Ex. 26, “Recycling and Treatment Facilities,” Tab A, “Administrative Order By Consent,” pg. 5. Over the years, toxic wastes were disposed of at the site. Id. Numerous hazardous substances including phenols, chlorinated ethane, heavy metals, cyanide and benzene have been found in the soil and groundwater on the site. Id.
2. Time Period of Damage. Hazardous substances were disposed of at this site beginning in 1955.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped wastes to the American Chemical Services site between 1955 and 1975. Plaintiffs’ Second Amended Complaint, pg. 29, para. 94. Alma Plastics shipped waste to this site in 1966. Plaintiffs’ Site Statements, 1-29. Alma Plastics was acquired by United Technologies Automotive (UTA), a subsidiary of UTC, in 1984. Id. On February 19, 1986, the EPA advised Inmont that it is a potentially responsible party in connection with environmental contamination at the site. Plaintiffs’ Second Amended Complaint, pg. 29, para. 92. On March 25,1987, the EPA also advised UTA that it is a potentially responsible party in connection with contamination at the site. Id.
*202 4. No Pre-acquisition Coverage. It is undisputed that Inmont and Alma Plastics shipped wastes to the American Chemical Services site sometime between 1955 and 1975. Plaintiffs’ Second Amended Complaint, pg. 29, para. 94; Plaintiffs’ Site statements, 1-29. Inmont was acquired by UTC in 1979. At the latest, all shipments by Inmont to the American Chemical Services site ceased in 1975, four years before Inmont’s acquisition by UTC. UTC’s subsidiary, United Technologies Automotive, acquired Alma Plastics in December 1984. Alma Plastics became a named insured under the Liberty Mutual policies on December 31,1984. All shipments by Alma Plastics to the American Chemical Services site ceased in 1966, eighteen years before Alma Plastics became a named insured of UTC. As a matter of law, no policy in effect prior to a subsidiary’s acquisition by UTC provides coverage for liabilities arising out of that subsidiary’s pre-acquisition activities. Therefore, there is no insurance coverage for the environmental contamination at this site.
5. Conclusion. Because all shipments by Inmont or Alma Plastic were made to this site prior to their acquisition by UTC, insurance coverage for environmental contamination of this site, under the Liberty Mutual policies, is not available. Summary judgment in favor of Liberty Mutual is therefore appropriate.
Bio-Ecology Systems, Grand Prairie, TX 4-32
The Bio-Ecology site is a waste disposal facility located on an eleven-acre tract in Grand Prairie, Texas.
1. Site Operations. Hie Bio-Ecology waste disposal site began operations in April of 1972. Affidavit of Gary S. Kull, Ex. 29, Tab A, “EPA Record of Decision, Bio-Ecology Site,” pg. 1. Permitted activities included the incineration of combustible liquids, slurries and sludges; the chemical treatment of acids, caustics and other waste chemical solutions; biological oxidation of waste waters; and a modified landfill of solids. Id. During the six-year operation of the facility, Bio-Ecology was cited for major violations including: the construction of retaining basins without authorization; the discharge of waste-water into Mountain Creek; allowing liquid levels in holding basins to overflow; the storage of drums, several times beyond the permit maximum; and several incidences of oil spills. Id. In June of 1973, heavy rains flooded the Bio-Ecology facility. Because of improper design, several storage basins overflowed into Mountain Creek. Id. at pg. 2. State clean-up efforts began in December of 1979. Id. All open receiving basins and pits were drained; containerized wastes were buried on-site and sludges in lagoons and landfills were consolidated. Id. In 1983, 80,000 gallons of liquids and fifteen storage tanks were removed. Id.
2. Time Period of Damage. Wastes were disposed of and stored at this site from 1972 through 1978. Plaintiffs’ Site statements, 4-32.
3. UTC Involvement. Mostek Corporation, a wholly owned subsidiary of UTC, delivered hydrofluoric acid and waste solvents to this site from June 1976, until September of 1977. Plaintiffs’ Second Amended Complaint, pg. 32, para. 105. On February 21, 1986, the United States Environmental Protection Agency named UTC as a potentially responsible party in connection with environmental contamination at this site. Id. at para. 103.
4. No Pre-acquisition Coverage. UTC acquired Mostek, Inc. in November 1979. Defendants’ Site Statements, 4-32. Mostek became a named insured of UTC under the Liberty Mutual policies, effective July 1, 1980. Id. There is no dispute that Mostek’s deliveries to the Bio-Ecology site occurred between 1976 and 1977, several years before Mostek became a named insured of UTC. Plaintiffs’ Site Statements, 4-32. As a matter of law, no policy in effect prior to the purchase of Mostek by UTC, provides coverage for liabilities arising out of Mostek’s pre-acquisition activities. Therefore there is no insurance coverage for environmental contamination at this site.
5. Conclusion. Because Mostek’s deliveries to the Bio-Ecology Site occurred before its acquisition by UTC, there is no insurance coverage for Mostek’s pre-acquisition activities. Summary judgment in favor of Liberty Mutual is therefore appropriate.
Bluff Road Site, Columbia, SC 5-33
The Bluff Road Site is a four-acre hazardous waste landfill located about ten miles southeast of Columbia, South Carolina.
1. Site Operations. This site was operated by South Carolina Recycling and Disposal, Inc. (SCRDI) from 1976 to 1982. Defendants’ Site Statements, 5-33. The storage of drummed chemicals at the site began in 1975. Affidavit of Gary S. Kull, Ex 1, “Landfills,” Tab A, “EPAAdministrative Consent Order,” pg. 3. In 1982, an investigation by the State of South Carolina revealed that organic contaminants had been found in the soils and groundwater at the site. Id. Soil samples revealed significant levels of pesticides, benzene, phenols and other chemicals. Id.
In United States of America v. Monsanto, 858 F.2d 160, 164 (4th Cir. 1988), the Fourth Circuit Court of Appeals found that:
Between 1976 and 1980, SCRDI haphazardly deposited more than seven thousand 55-gallon drums of chemical waste on the four-acre Bluff Road site. It placed waste-laden drums and containers wherever there was space, often without pallets to protect them from the damp ground. It stacked drums on top of one another without regard to the chemical compatibility of their contents. It maintained no documented safety procedures and kept no inventory of the stored chemicals. Over time, many of the drums rusted, rotted and otherwise deteriorated. Hazardous substances leaked from the decaying *203 drums and oozed into the ground. The substances commingled with incompatible chemicals that had escaped from other containers, generating noxious fumes, fires and explosions.
Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 5, Tab D. Further, the court noted that:
In 1980, the Environmental Protection Agency (EPA) inspected the Bluff Road site. Its investigation revealed that the facility was filled well beyond its capacity with chemical waste. The number of drums and the reckless manner in which they were stacked precluded access to various areas in the site. Many of the drums observed were unlabeled, or their labels had become unreadable from exposure, rendering it impossible to identify their contents. The EPA concluded that the site posed a “major fire hazard.”
Id. Monsanto, 858 F.2d at 165.
2. Time Period of Damage. The Bluff Road Site began operations in 1976. Plaintiffs’ Second Amended Complaint, pg. 33 para. 108. Leaking hazardous substances caused chemical fires at the site in 1977 and 1979. Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 5, Tab D, Monsanto, 858 F.2d at 164. The EPA began investigations at the site in 1980. Id. at 165. Joint federal and state cleanup efforts were completed in 1982. Id.
3. UTC Involvement. Inmont, a subsidiary of UTC, sent waste from their Charlotte, North Carolina plant to the Bluff Road site from December of 1977 through July of 1978. Plaintiffs’ Site Statements, 5-33. On May 1, 1987, the EPA advised Inmont that it is a potentially responsible party in connection with environmental contamination at the Bluff Road site. Plaintiffs’ Second Amended Complaint, pg. 33, para. 107.
4. No Pre-acquisition Coverage. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier became a named insured under the Liberty Mutual policies effective November 1, 1980. Inmont shipped waste to the Bluff Road site from December of 1977, through July of 1978. Because Inmont shipped waste to the Bluff Road site prior to becoming a named insured under the UTC policies, as a matter of law there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site.
5. Conclusion. Inmont’s deliveries to the Bluff Road site occurred prior to its acquisition by UTC. Therefore, Liberty Mutual is not obligated to provide insurance coverage for environmental contamination caused by Inmont’s pre-acquisition activities. Summary judgment in favor of Liberty Mutual is therefore appropriate.
Bragg Site, Marion IN 6-34
The Bragg site occupies a forty-five — acre site alongside the Mississippi River, and is located just outside of Marion, Indiana.
1. Site Operations. From 1935 to approximately 1961, this site was used as a sand and gravel quarry. Affidavit of Gary S. Kull, Ex. 2, “Landfills,” Tab A, “EPA Record of Decision,” pg. 1. From 1949 through 1970, RCA Corporation used portions of the site for industrial refuse disposal. Id. From 1957 to 1975, Bragg Construction used the site as a municipal landfill. Id. Wastes were emptied from drums and “worked” into the landfill with a bulldozer. Id. Fires created from this disposal operation destroyed two bulldozers. Id. Drums were then rinsed and resold. Id. In 1975, Bragg Construction ceased operations at the landfill. Id. An EPA investigation in 1987 revealed that the surface soil at the site was contaminated with phthalate, lead, mercury, and hydrocarbons. Id. at 4.
2. Time Period of Damage. From 1949 through 1975, this site was used for industrial refuse disposal and as a municipal landfill.
3. UTC Involvement Essex, a subsidiary of UTC, sent waste materials to the Bragg site on August 7, 1978. Plaintiffs’ Site Statements, 6-34. On August 12, 1987, Essex received a letter from the United States Environmental Protection Agency designating Essex as a potentially responsible party in connection with environmental contamination at the Bragg site. Affidavit of William F. Leikin In Support of Plaintiffs’ Response in Opposition to Dismissal of Non-New England Sites, Ex. 6. On July 23,1990, the United States filed suit against various defendants, including Essex, to recover costs for activities in response to the contamination at the site. Id. at Tab B. United States v. Yount et al.
4. No Sudden and Accidental Release. UTC contends that two separate accidental and abrupt fires occurred at this site and caused contamination. Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 6. In addition, UTC asserts that a flood occurred at this site sometime between 1962 and 1975 which contributed to the contamination of this site. Id. However, the EPA Record of Decision for this site states that the Indiana State Board of Health found that “operations at the landfill were continually conducted in an unacceptable manner.” Affidavit of Gary S. Kull, Ex. 2, “Landfills,” Tab A, “EPA Record of Decision.” Hazardous wastes were dumped at this site and “worked” into a landfill with bulldozers. Id. at 1.
5. Pollution Exclusion. Essex shipped wastes to this site in 1978. Plaintiffs’ Site Statements, 6-34. Since all shipments were made after the 1970 implementation of the pollution exclusion clause, coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. The defendants have set *204 forth facts which indicate that the contamination of the site was due to the intentional dumping of hazardous substances and was not caused by a “sudden and accidental” event. Faced with a showing that coverage is precluded by the pollution exclusion clause, the plaintiffs have the burden of producing countervailing materials showing that the polluting event was “sudden and accidental” in order to avoid summary judgment.
Hazardous wastes at this site were intentionally dumped and worked into a landfill. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). Since it is unlikely that the plaintiffs will be able to produce sufficient evidence at trial to carry their burden, the defendant is entitled to summary judgment.
6. Conclusion. Because the release of contaminants cannot be deemed to have been sudden and accidental, the pollution exclusion clause precludes coverage, under the main body of the policies, for the environmental contamination at this site. Any third-party claim under Endorsement 4 might be considered if all other terms and conditions of the policies are met. Partial summary judgment in favor of Liberty Mutual is therefore appropriate based on the pollution exclusion clause.
Butler Mine Tunnel, Pittstown, PA 7-35
Located in Pittstown, Pennsylvania, the Butler Mine Tunnel was constructed in the 1930s as a collection tunnel for mine drainage from anthracite mines. The Butler Mine Tunnel discharges into the Susquehanna River.
1. Site Operations. In June and July of 1979, a borehole connected to the tunnel and located behind a gas station in Pittstown was utilized to illegally dispose of liquid hazardous waste. Affidavit of Gary S. Kull, “Landfills” Ex. 11, Tab A, “Site Narrative,” pg. 44. The owner of the gas station allowed oil tank trucks to dump their wastes into the borehole for a fee. Id. at 44-45. In late July of 1979, the Pennsylvania Department of Environmental Resources discovered an oily discharge on the Susquehanna River originating from the Butler Mine Tunnel. Id. The oil slick was reported to be sixty miles long. Id. In October of 1985, following Hurricane “Gloria,” another long oily discharge from the Butler Mine Tunnel was found on the Susquehanna River. Id. at 46. The EPA estimates that approximately two million gallons of waste oil, including TCE, cyanide, dichlorobenzene, toluene, xylene, naphthalene, ethyl, benzene and phenols were illegally dumped at this site. Id. at 49.
2. Time Period of Damage. This site was used to illegally dispose of hazardous substances between mid-1978 through late 1979. Plaintiffs’ Site Statements, 7-35.
3. UTC Involvement. On June 2, 1986, the EPA advised Pratt & Whitney, a subsidiary of UTC, that they were a potentially responsible party in connection with environmental contamination at the Butler Mine Tunnel. Plaintiffs’ Second Amended Complaint, pg. 35, para. 116. The EPA alleged that wastes removed from the Pratt & Whitney plant by an independent waste hauler were illegally dumped into the Butler Mine Tunnel through the gas station borehole. Id. at para. 117. These acts occurred between 1978 and 1979. Id. The United States filed suit on Nov. 29, 1989, to which UTC was named as a defendant. Affidavit of Robert A. Argazzi, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 7, Tab B. United States of America v. Alcan Aluminum Corp.
4. No Sudden and Accidental Release. UTC contends that “a hurricane caused a sudden release of hazardous substances from the Butler Mine Tunnel into the Susquehanna River.” Affidavit of Robert A. Argazzi, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 7. UTC ignores the fact that over two million gallons of hazardous waste was intentionally and illegally dumped into this tunnel by carriers seeking a low-cost method of hazardous waste disposal. The hurricane did not cause this contamination. The contamination at this site can only be attributable to deliberate, intentional and illegal dumping.
5. Pollution Exclusion. It is undisputed that a carrier hired by Pratt & Whitney dumped hazardous waste into the Butler Mine Tunnel sometime between 1978 and 1979. Plaintiffs’ Site Statements, 7-35. Since all shipments were made after the 1970 implementation of the pollution exclusion clause, coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. The defendants have set forth facts which indicate that the contamination of the Butler Mine Tunnel was due to the intentional dumping of hazardous substances and was not caused by a “sudden and accidental” event. Faced with a showing that coverage is precluded by the pollution exclusion clause, the plaintiffs have the burden of producing countervailing materials showing that the polluting event was “sudden and accidental.”
Here, the contamination of the Butler Mine Tunnel was caused by the illegal and intentional dumping of hazardous substances. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). Since it is unlikely that the plaintiffs will be able to produce sufficient evidence at trial to carry their burden, the defendant is entitled to summary judgment.
6. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, the pollution exclusion clause precludes *205 coverage, under the main body of the policies, for the environmental contamination at this site. Any third-party claim under Endorsement 4 might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate based upon the pollution exclusion clause.
Chem Dyne, Hamilton, OH 10-38
Chem-Dyne is a waste handling facility located on a ten-acre site in Hamilton, Ohio.
1. Site Operations. Chem-Dyne was in operation from the fall of 1975, until February of 1980. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 9, Tab D, “Remedial Investigation/Feasibility Study,” pg. 2. Chem-Dyne provided waste handling services to major industries in the region. Id. Drum and bulk waste materials were accepted and prepared for recycle, resale, or were disposed of at different sites. Id. Materials handled included pesticides, chlorinated hydrocarbons, solvents, waste oils, plastics and resins, PCB’s, acids and caustics, heavy metal and cyanide sludges. Id. As a result of five fish kills in 1976, and an incident with a fuming tank car in 1979, the company was ordered to remove all waste from the site. Id. A lack of progress and two fires on the site in 1979 resulted ina 1980 court orderplacing the company in receivership. Id. From 1975 to 1980, thousands of barrels and several million gallons of hazardous substances were handled, stored, treated and disposed of at the site, and that as a result of such operations contaminants were released into the environment. Affidavit of Gary S. Kull, “Recycling and Treatment Facilities” Ex. 30, Tab A, “Letter of the Ohio Attorney General.”
2. Time Period of Damage. From 1975 through February 4, 1980, millions of gallons of hazardous waste was disposed of at this site.
3. UTC Involvement Inmont and Essex, both subsidiaries of UTC, shipped wastes to this site. Plaintiffs’ Site Statements, 10-38. Essex shipped wastes to this site on November 21, 1978, and March 29, 1979. Defendants’ Motion for Summary Judgment, Ex. 9. The dates of Inmont’s shipments are unknown. Id. On May 9, 1980, the United States Environmental Protection Agency sued the operators of the Chem-Dyne site. Plaintiffs’ Site Statements, 10-38. Inmont and Essex were joined as defendants. Id. On March 26, 1982, both Essex and Inmont received notice that they had been identified as potentially responsible parties for contamination at the Chem-Dyne Site. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 9.
4. No Pre-acquisition Coverage — Inmont It is undisputed that the Chem-Dyne site ceased operations in February of 1980. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 9, Tab D, “Remedial Investigation/Feasibility Study,” pg. 2. Inmont became a named insured of UTC in November of 1980. Therefore, all shipments to the Chem-Dyne site were made prior to Inmont’s acquisition by UTC. As a matter of law, no policy in effect prior to UTC’s acquisition of Inmont provides coverage for liabilities arising out Inmont’s pre-acquisition activities.
5. No Sudden and Accidental Release. UTC contends that the contamination at this site was caused by a filming tank car and two accidental fires in 1979. Affidavit of Azuwuike H. Ndukwu, In Support of Opposition to Dismissal of Non-New England Sites, Ex. 9. However, UTC fails to establish any causal relation between these occurrences and the contamination at this site. Further, UTC ignores the EPA finding that between twenty-five to thirty thousand barrels of hazardous waste was stored at this site, and that five fish kills occurred in 1976 alone. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 9, Tab D, “Remedial Investigation/Feasibility Study,” pg. 1. UTC also ignores the conclusion of the Ohio Attorney General that the release of hazardous substances at this site was caused by the improper handling, storage, treatment and disposal of hazardous substances. Affidavit of Gary S. Kull, “Recycling and Treatment Facilities,” Ex. 30, Tab A, “Letter of the Ohio Attorney General.”
6. Pollution Exclusion. It is undisputed that Chem-Dyne was in operation from 1974 until it was placed in receivership in February of 1980. Plaintiffs’ Second Amended Complaint, pg. 38, para. 129. Therefore all shipments by Essex were made to the site after the 1970 implementation of the pollution exclusion clause. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination was caused by fire which caused the abrupt release of contaminants. Liberty Mutual has set forth facts which indicate that the contamination was due to pollution-prone operating practices. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, millions of gallons of hazardous substances and thousands of waste drums were dumped at this site over a period of several years. Several fish kills resulted from the apparent release of hazardous substances into the environment. The Ohio Attorney General concluded that the contamination at this site was caused by improper waste handling and storage procedures. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner would directly result in environmental contamination. In light of these facts, it is unlikely that UTC will be able to *206 produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
7. Conclusion. Because all deliveries by Inmont to the Chem-Dyne site were made prior to Inmont’s acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for environmental contamination caused by Inmont’s pre-acquisition activities. Therefore, summary judgment in favor of Liberty Mutual, in regards to shipments made to this site by Inmont, is appropriate. Further, because the release of contaminants at this site cannot be deemed to have been sudden and accidental there is no insurance coverage, under the main body of the policies, for environmental contamination caused by shipments to this site by Essex. A third-party claim under Endorsement 4 for gradual pollution might be considered for Essex’s shipments if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual in regards to shipments to this site by Essex is also appropriate.
Chemical Control Site, Elizabeth, NJ, 11-39
This site, located on two acres in Elizabeth, New Jersey, was used to treat and dispose of a wide variety of hazardous wastes.
1. Site Operations. The Chemical Control site was in operation from 1970 until 1978. Defendants’ Motion for Summary Judgment, Ex. 34; Plaintiffs’ Site Statements, 11-39. By 1977, large quantities of hazardous substances had been stockpiled on the site. Affidavit of Carol A. Kelly, Ex. 2. In 1978, nearby sewer lines were found to be contaminated with solvents. Id. Drums stockpiled five high along the Elizabeth River were found to be leaking and severely deteriorated. Id. By March of 1979, fifty thousand drums were located on the site. Id. The drum contents included chemical, explosive, toxic, infectious and radioactive agents. Id. This site has been contaminated by substances including arsenic, azide, cyanide, nitric acid, PCB’s, pesticides, solvents and metals. Plaintiffs’ Second Amended Complaint, pg. 39, para. 132. In March of 1979, the New Jersey Department of Environmental Protection (NJDEP) began clean-up operations. Defendants’ Site Statements, 11 -39. A fire occurred on April 21,1980, causing explosions and the destruction of drums. Affidavit of Antonio B. Braz, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 10. As a result, drum contents were released into the surrounding waters. Id.
2. Time Period of Damage. Hazardous wastes were disposed of at this site from 1970 through 1978.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site from 1970 through 1978. Plaintiffs’ Site Statements, 11-39. On October 7, 1987, the NJDEP advised Inmont that it is a potentially responsible party in connection with the environmental contamination at the Chemical Control Site. Id. Plaintiffs’ Second Amended Complaint, pg. 39, para. 131-132.
4. No Pre-acquisition Coverage. It is undisputed that all of Inmont’s shipments to the Chemical Control site occurred between 1970 and 1978. Plaintiffs’ Site Statements, 11-39. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. Conclusion. Because all deliveries by Inmont to the Chemical Controls site were made prior to Inmont’s acquisition by UTC, there is no insurance coverage, under the Liberty Mutual policies, for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate on pre-acquisition grounds.
Distler Farm and Distler Brickyard, West Point & Jefferson County, KY 21-42
The Distler Farm and Distler Brickyard are liquid chemical waste disposal sites located in West Point, Kentucky and in Jefferson County, Kentucky.
1. Site Operations. The Distler Farm and Distler Brickyard were in operation from 1975 to 1982. Plaintiffs’ Site Statements, 21 -42. According to an EPA Complaint, in August 1976, Donald Distler formed Kentucky Liquid Disposal. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 19, Tab C, United States of America v. Donald E. Distler, pg. 6. Chemical wastes obtained by Kentucky Waste Disposal were deposited at the Distler Farm site for disposal, treatment or storage. Id. Hazardous substances leached and spilled from containers deposited at the site and contaminated the soil and groundwater. Id. This site has been contaminated by hazardous substances including trichloroethane, isophone, naphthalene, xylene, arsenic, cadmium, chromium, cyanide, lead and zinc. Id. In January of 1979, a flood of the Ohio River inundated the Farm site. Id. at pg. 7. As the flood waters receded, drums were left scattered around the site, leaking hazardous substances into the ground. Id.
2. Time Period of Damage. These sites were in operation from 1975 to 1982.
3. UTC Involvement Inmont and Essex, two subsidiaries of UTC, have been identified by the EPA as having shipped hazardous wastes to the Distler Farm and Distler Brickyard. Plaintiffs’ Site Statements, 21-42; Plaintiffs’ Second Amended Complaint, pg. 48, para. 166-68. Inmont shipped waste to this site in 1976. Essex shipped waste to this site from 1979 to 1980. Plaintiffs’ Site Statements, 21-42. On November 12,1985, the EPA advised Inmont and Essex that they are potentially responsible parties in connection with environmental contamination at the Distler Farm and Distler Brickyard. Affidavit of Azuwuike H. Ndukwu, *207 In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 19, Tab A & B. On March 25, 1988, the EPA initiated suit against various defendants including the BASF Corporation, successor-in-interest to Inmont, and Essex, to recover cleanup costs incurred by the EPA. Id. Ex. 19.
4. No Pre-acquisition Coverage — Inmont. It is undisputed that all of Inmont’s shipments to the Distler Sites were made in 1976. Plaintiffs’ Site Statements, 21-42. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. Therefore, Inmont did not become a named insured of UTC until four years after its last shipment to the Distler sites. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC. Therefore, summary judgment in favor of Liberty Mutual regarding Inmont’s shipments to these sites is appropriate.
5. Summary Judgment Regarding Essex Cannot Be Granted. Liberty Mutual has moved for summary judgment in regards to the Distler Farm and Distler Brickyard sites on the grounds that the contamination of these sites was caused by long-term, pollution-prone operating practices and was not caused by any sudden and accidental event. However, the only evidence submitted in support thereof is insufficient. The defendants’ motion relies upon facts derived from a Complaint filed by the EPA in 1988, which states that contamination at the Distler Farm site was caused by the spill of hazardous substances. Defendants’ Site Statements, 21-42. The facts derived from this Complaint are mere allegations and cannot serve as a basis for summary judgment. Similarly, the defendants also rely upon a Louisville Times article which recounts that “the EPA found that the groundwater beneath the Farm and Brickyard sites was contaminated by drums containing industrial waste.” Plaintiffs’ Site Statements, 21-42. The defendants’ have failed to submit any “findings” made by the EPA in regards to these sites which could serve as a basis for summary judgment. Therefore, summary judgment in regards to shipments made by Essex to these sites is not appropriate.
6. Conclusion. Because all deliveries by Inmont to the Distler Farm and Brickyard Sites were made in 1976, several years prior to Inmont’s acquisition by UTC, there is no insurance coverage, under the Liberty Mutual policies for the environmental contamination caused by Inmont’s pre-acquisition shipments. Therefore, Liberty Mutual is entitled to summary judgment in regards to shipments made to these sites by Inmont. However, Liberty Mutual has failed to establish a factual foundation sufficient to warrant summary judgment in regards to Essex’s shipments to these sites. Therefore, summary judgment in favor of Liberty Mutual is granted in regards to all shipments made to this site by Inmont and is denied in regards to all shipments made to this site by Essex.
Dreyfus Street, Columbia, SC 22-49
The Dreyfus Street site is a one-half — acre parcel of land located in Columbia, South Carolina.
1. Site Operations. From 1977 to 1981, this facility operated as a storage and disposal site for hazardous substances. Affidavit of Gary S. Kull, Ex. 5, Tab A, United States v. Columbia Steel and Metal Co. et al., pg. 6. On June 24, 1983, the United States Environmental Protection Agency initiated an action to recover cleanup costs. Id. at 1. The Complaint in that action is the sole source of facts for Liberty Mutual’s motion for summary judgment. The Complaint alleged that chemical wastes were stored at this site in fifty-five gallon drums. Id. at pg. 6. Many containers corroded and ruptured causing their contents to leak into the ground. Id. In addition, several fires occurred at the site and fumes were observed escaping from drums. Id. The EPA Complaint further alleged that in August of 1978, the South Carolina Department of Health and Environmental Control filed suit seeking cleanup of the Dreyfus Street site. Id at 8. As a result of these proceedings, some drums of hazardous waste were removed from the site. Id. The EPA Complaint alleged that by September of 1981, approximately five hundred and fifty drums in varying states of deterioration remained at the site. Id. During September 1981, the release of hazardous substances at the site continued. Id. From September 22, 1981, until October 30, 1981, the United States Environmental Protection Agency undertook measures to remove all drums of waste and contaminated soil from the site. Id. UTC asserts that soil and groundwater at the site have been contaminated by such substances as acids, sodium peroxide, hydrogen peroxide and ether. Plaintiffs’ Second Amended Complaint, pg. 49, para 171.
2. Time Period of Damage. The Dreyfus Street site was in operation from at least 1977 to 1981.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site. However, the dates of these shipments remains undetermined. Plaintiffs’ Site Statements, 22-49. The Dreyfus site was only in operation from 1977 through 1981. Id. On June 24, 1983, the United States Environmental Protection Agency initiated an action against numerous defendants, including Inm-ont, to recover cleanup costs incurred by the EPA in connection with the Dreyfus Street site. Affidavit of William F. Leikin In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 20.
4. Summary Judgment For This Site Cannot Be Granted. Liberty Mutual has moved for summary judgment in regards to the Dreyfus Street site on the grounds that the contamination of the site was caused by long-term, pollution-prone operating practices and was not caused by any sudden and accidental event. However, the only evidence submitted in support *208 thereof is insufficient. The defendants’ motion relies upon facts derived from a Complaint filed by the EPA in 1983, which states that contamination at the site was caused by the spill of hazardous substances. Affidavit of Gary S. Kull, Ex. 5, Tab A, pg. 6-8. The facts derived from this Complaint are mere allegations and cannot serve as a basis for summary judgment.
5. Conclusion. Liberty Mutual has failed to establish a factual foundation sufficient to warrant summary judgment in regards to Inmont’s shipments to the Dreyfus Street site. Therefore, Liberty Mutual’s motion for summary judgment in regards to this site is denied.
Duane Marine Site, Perth Amboy, NJ 23-49
The Duane Marine site, located in Perth Amboy, New Jersey, was operated as a hazardous waste disposal and treatment facility.
1. Site Operations. From April 1975 until July 1980, hazardous wastes were stored, treated and disposed of at the Duane Marine site. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 21, Tab B. “EPA Administrative Order,” pg. 6-8. On July 7, 1980, a major fire spread to the Duane Marine facility, resulting in the destruction of approximately two thousand 55-gallon drums of waste chemicals. Id. The owners of Duane Marine abandoned the site after the fire. Id. The abandoned site contained chemical wastes stored in tanks, drums, truck trailers, and roll-off containers. Id. Since 1980, numerous spills, leaking drums, leaking trailers and leaking roll-off containers have caused contamination. Id. This site has been contaminated by numerous substances including benzene, toluene, arsenic, chromium, lead and PCB’s. Id. Plaintiffs’ Site Statements, 23-49.
2. Time Period of Damage. Hazardous wastes were deposited at this site from 1975 until the facility was abandoned in 1980.
3. UTC Involvement. Inmont, a subsidiary of UTC, shipped waste to this site from September 1978, through August 1980. Plaintiffs’ Site Statements, 23-49; Defendants’ Motion for Summary Judgment, Ex. 40. On December 3, 1984, the EPA advised Inmont that it is a potentially responsible party in connection with environmental contamination at the Duane Marine site. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 21.
4. No Pre-acquisition Coverage. It is undisputed that Inmont’s last shipment to the Duane Marine site occurred in August of 1980. Plaintiffs’ Site Statements, 23-49. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. In-mont therefore became a named insured of UTC in November of 1980, several months after its last shipment to the site. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5.Conclusion. Because all deliveries by Inmont to the Duane Marine site were made prior to Inmont’s acquisition by UTC, there is no insurance coverage, under the Liberty Mutual policies, for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate on pre-acquisition grounds.
Enviro-Chem Site, Zionsville, IN 28-54
The Enviro-Chem site is located in Zionsville, Indiana. The site sits on a six-acre site within the one hundred and sixty-eight — acre Northside Sanitary Landfill.
1. Site Operations. The Enviro-Chem site began operations in August of 1977. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 24, Tab D, “Meeting of Potentially Responsible Parties,” pg. 1. Enviro-Chem was engaged in the recovery and brokering of primary solvents, oils and other wastes received from industrial clients. Id. Waste products were received in drums and bulk tankers and were prepared for reclamation or disposal. Id. Contained on the site were twenty-five thousand drums, forty-seven bulk storage tanks and a cooling water pond. Id. Wastes stored at the site included acetone, trichloroethylene, toluene, xylene, cadmium, chromium, lead, nickel, mercury, methylene chloride and ethyl benzene. Id. at Tab A, United States of America v. Environmental Conservation and Chemical Corporation, et al., para. 287. On July 31, 1979, the Indiana State Board of Health received a report that an oil spill had occurred into Eagle Creek, north of Zionsville. Id. at Tab D, pg. 1. A follow-up investigation revealed that Enviro-Chem had intentionally discharged process and cooling water from a storage lagoon into a creek without a permit. Id. In December of 1979, the Indiana State Board of Health found that Enviro-Chem had burned chlorinated hydrocarbons and other solvents, and had discharged water and contaminated storm-water without approval. Id. at pg. 4. In addition, spills of oil and other objectionable substances which occurred on the Enviro-Chem site were never reported to the appropriate authorities nor effectively cleaned up. Id. In February of 1981, Enviro-Chem’s drum storage area was found to be extremely overcrowded with drums, some of which were damaged and leaking. Id. On May 5, 1982, Enviro-Chem was ordered to close. Id. From March 1983 through 1984 surface contaminants were removed from the site. Affidavit of Gary S. Kull, “Recycling and Treatment Facilities,” Ex. 34, Tab A, “EPA Record of Decision,” pg. 1. Thirty thousand drums of waste, two hundred and twenty thousand gallons of hazardous waste in tanks, twenty thousand gallons of contaminated water, and five thousand six hundred cubic yards of contaminated soil and cooling pond *209 sludge were all removed from the Enviro-Chem site. Id. at pg. 2.
2. Time Period of Damage. Enviro-Chem .began operations in 1977 and the site was closed in 1982.
3. UTC Involvement. Three UTC subsidiaries, Essex, Inmont and Alma Plastics, delivered wastes to this site. Defendants’ Motion for Summary Judgment, Ex. 5; Plaintiffs’ Second Amended Complaint, pg. 54, paragraphs 193-96. Essex shipped waste to Enviro-Chem between September 15, 1981, and January 6, 1982. Plaintiffs’ Site Statements, 28-54. The dates of Inmont’s shipments to Enviro-Chem are unknown. Alma Plastics shipped wastes to Enviro-Chem several times between September of 1978 and September of 1979. Id. In March of 1983, the United States Environmental Protection Agency notified Essex that it is a potentially responsible party with respect to contamination at the Enviro-Chem site. Plaintiffs’ Second Amended Complaint, pg. 54, paragraphs 193-96. Inmont was notified of their status as a potentially responsible party on January 28, 1987. Id. Essex and Inmont were also named as defendants in a lawsuit filed by the United States. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 24, Tab A. United Technologies Automotive, a subsidiary of UTC who purchased Alma Plastics in 1984, was notified that it was a potentially responsible party on May 14, 1984. Id. at Ex. 24.
4. No Pre-acquisition Coverage — UTA. It is undisputed that Alma Plastics shipped waste to this site from 1978 to 1979. Plaintiffs’ Site Statements, 28-54. Alma Plastics was acquired by UTA, a subsidiary of UTC, in December of 1984. Defendants’ Site Statements, 28-54. Alma Plastics became a named insured of UTC on December 31, 1984, five years after their last shipment to this site. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Alma Plastics’ activities prior to the date on which Alma Plastics became a named insured of UTC.
5. No Sudden and Accidental Release. UTC contends that in July of 1979, heavy rains caused a storage lagoon containing cooling and process waters to overflow and discharge into a public creek. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 24. However, the report that UTC relies upon actually states that “Enviro-Chem intentionally discharged process and cooling water from a storage lagoon into Finley Creek without a permit.” Id. at Tab D, “Environmental Conservation & Chemical Corporation, Meeting of Potentially Responsible Parties,” pg. 1. In addition, on repeated occasions, Enviro-Chem was cited for the improper incineration of hazardous substances, the improper release of contaminants into local streams, and the improper storage of hazardous substances. Id.
6. Pollution Exclusion. It is undisputed that Enviro-Chem was only in operation from 1978 until 1982. Plaintiffs’ Second Amended Complaint, pg. 54, paragraphs 193-96. Any shipments made by Essex or Inmont must have been made within this time period. Therefore all shipments were made to the site after the 1970 implementation of the pollution exclusion clause. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination was caused by an accidental overflow of a lagoon. Liberty Mutual has set forth facts which indicate that the contamination of this site was due to improper waste handling and disposal practices including the intentional disposal of hazardous substances into a nearby stream. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, hazardous substances were stored in thousands of drums, tanks and a cooling pond. Waste was intentionally released into a nearby creek; solvents were burned without proper authorization; oil spills were never reported, and deteriorating drums were stored in an overcrowded area. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner would directly result in contamination.
Enviro-Chem’s release of contaminants into the environment was intentional. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to cany their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
7.Conclusion. All deliveries of Alma Plastics to the Enviro-Chem site were made before Alma Plastics became a named insured of UTC. Therefore, summary judgment, as it concerns Alma Plastics, is appropriate in favor of Liberty Mutual. Further, because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no coverage under the main body of the insurance policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore partial summary judgment, as it concerns Inmont and Essex, is also appropriate in favor of Liberty Mutual.
Fisher-Calo Chemical and Solvents Site, Kingsbury, IN 29-55
The Fisher-Calo Chemical and Solvents site is located on a two-hundred — acre site in Kingsbury, Indiana.
*210 1. Site Operations. The Fisher-Calo site was formerly operated as a spent solvents and metal finishing waste facility. Affidavit of Peter A. Gutermann, In Support of Plaintiffs’ Opposition of Dismissal of Non-New England Sites, Ex. 25, Tab B. “EPAAdministrative Order,” pg. 2. Wastes, including still-bottoms and acids were stored at the site in drums, tanks, and other containers. Id. On March 31, 1978, a large chemical fire destroyed a portion of the site. Id. at Tab C, “Site Activity Report,” pg. 3. Explosions resulted in the evacuation of over 10,000 residents from the area. Id. In November of 1987, the United States Environmental Protection Agency and the Indiana Department of Environmental Management initiated a site investigation of the Fisher-Calo site. Id. at Tab B. “EPA Administrative Order,” pg. 2. The investigation revealed approximately sixty-four above-ground and three underground storage tanks containing hazardous wastes. Id. at 3. Four partially buried storage tanks contained a viscous, black liquid. Id. Several hundred drums containing wastes were found adjacent to some of the buildings on the site. Id. Most of the drums were severely deteriorated and many were leaking their contents onto the ground. Id. Sixteen bumt-out, empty tanks were observed on their sides. Id. Areas of visibly contaminated surface soil was evident throughout the site. Id. at 3. Inside one of the buildings located on the site, inspectors found three thousand 55-gallon drums containing wastes. Id. Many of the drums showed visible signs of deterioration, corrosion and leakage. Id.
2. Time Period of Damage. The Fisher-Calo Chemicals & Solvents site consists of two separate facilities, the One-Line Road and the Two-Line Road. The One-Line Road was in operation from 1972 to 1978. The Two-Line Road facility began operations in 1941. Plaintiffs’ Site Statements, 29-55.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site from November of 1981, to September of 1984. Id. On February 5, 1988, the EPA advised Inmont that it is a potentially responsible parly in connection with environmental contamination at the Fisher-Calo Chemicals & Solvents Site. Plaintiffs’ Second Amended Complaint, pg. 55, Para. 197.
4. No Sudden and Accidental Discharge. UTC contends that a sudden and accidental chemical fire in 1978 caused contamination at this site. Affidavit of Peter A. Gutermann, In Support of Plaintiffs Opposition to the Non-New England Sites, Ex. 25. UTC, however, ignores the EPA finding that contamination resulted when several hundred barrels of hazardous wastes leaked their contents onto the ground. Id. at Tab B. “EPAAdministrative Order,” pg. 3.
5. Pollution Exclusion. It is undisputed that all shipments made by Inmont to the Fisher-Calo site occurred between November of 1981 and September of 1984. Plaintiffs’ Site Statements, 29-55. Therefore all shipments were made to the site after the 1970 implementation of the pollution exclusion clause in all relevant insurance policies. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination was caused by a large chemical fire which occurred in 1978. Liberty Mutual has set forth facts which indicate that the contamination of this site was due to the deterioration of thousands of drums containing hazardous substances. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, hazardous substances were stored in thousands ofdrums. Most of these drums deteriorated over a period of time and released their contents into the environment. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner would directly result in contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental there is no coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate on the grounds of the pollution exclusion clause.
Frink’s Industrial Waste Site, Winnebago County, IL 31-57
The Frink’s Industrial Waste, site is a hazardous waste treatment and storage facility located in Winnebago County, Illinois.
1. Site Operations. This site began accepting hazardous wastes in 1979. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 27, Tab A, “Notice Pursuant to the Illinois Environmental Protection Act,” at pg. 2. Wastes accepted included oils, cyanide, solvents, thinners, acids and alkalis. Id. at pg. 3. Wastes were stored and treated in four concrete tanks, eleven underground steel oil tanks, two material-water separation tanks, and two unlined lagoons. Id. at 3. Soil and groundwater in the areas of the unlined lagoons, the underground storage tanks, and the underground water-separation tanks were heavily contaminated by substances including acetone, cadmium, ethylben-zene, toluene, trans-dichloroethylene and xylene. Id. *211 Plaintiffs’ Second Amended Complaint, pg. 57, para. 203-05; Affidavit of Gary S. Kull, Ex. 37, “Recycling and Treatment Facilities.” 2.
2. Time Period of Damage. Hazardous wastes were stored at this site from 1979 through 1986. Affidavit of Azuwuike H. Ndukwu, In Support of Opposition to Dismissal of Non-New England Sites, Ex. 27, Tab A, pg. 2. Contamination was discovered in February of 1988. Id.
3. UTC Involvement. Essex, a subsidiary of UTC, shipped waste to this site from 1979 to 1981. Plaintiffs’ Site Statements, 31-57. On February 19, 1988, the Illinois Environmental Protection Agency (IEPA) advised Essex that it is a potentially responsible party in connection with contamination at the site. Plaintiffs’ Second Amended Complaint, pg. 57, para. 203-05.
4. No Sudden and Accidental Discharge. UTC contends that the contamination at this site was caused by the abrupt destruction of lagoon linings. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Non-New England Sites, Ex. 27. Officials at Frink’s Industrial Waste, Inc. allege: “there was no release on the site until after the IEPA opened and destroyed that lining of the lagoon previously closed with IEPA approval.” Id. at Tab B. UTC ignores the IEPA finding that the lagoons on the site were unlined. Id. at Tab A, pg. 3. UTC also ignores the fact that the investigation of the IEPA revealed extensive contamination in the vicinity of the underground storage tanks and water-separation tanks as well as in the vicinity of the lagoons. Id. Even assuming that the lagoons were lined and were destroyed by the IEPA, UTC fails to come forward with any evidence to explain the contamination which was discovered in the vicinity of the underground tanks. The evidence indicates that pollution-prone operations were conducted at this site over a long period of time.
5. Pollution Exclusion. It is undisputed that Essex made shipments to the site between 1979 and 1981. Plaintiffs’ Site Statements, 31-57. Therefore, all shipments were made to the site after the 1970 implementation of the pollution exclusion clause in all relevant insurance policies. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination was caused when officials from the IEPA destroyed a lagoon lining. Liberty Mutual has set forth facts which indicate that the contamination of this site was due to the placement of hazardous wastes in unlined lagoons and to the gradual deterioration of underground storage tanks. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, hazardous substances were stored in underground storage tanks and in a waste lagoon. The storage tanks and the waste lagoon have both been identified as sources of contamination at this site. It is not beyond the long range expectations of UTC that hazardous substances stored in storage tanks or in a waste lagoon could directly result in contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate on the grounds of the pollution exclusion clause.
I. J. Recycling Site, Fort Wayne, IN 33-58
The I.J. Recycling site is a hazardous waste storage and recycling facility located on a four-acre site in Fort Wayne, Indiana
1. Site Operations. This site operated from 1979 through 1986. Plaintiffs’ Site Statements, 33-58. The site consists of three main buildings (A,B,C), a fire house, two pump houses, and a tank farm. Affidavit of Gary S. Kull, Ex. 38, “Recycling and Treatment Facilities,” Tab A, “EPA Administrative Order,” pg. 2. Wastes, including sodium hydroxide, sodium sulfide, sulfuric acid, nitric acid, aluminum sulfate, chromic acid, and paint and oil wastes were stored on-site in two thousand seven hundred drums, sixty-four storage tanks and three tankers. Id. A September 23,1986 inspection by the United States Environmental Protection Agency revealed that an estimated four hundred thousand gallons of waste were located on-site. Id. In the garage area of Building A, an estimated five hundred and twenty-five drums were stacked in rows. Id. Some leakage from these tanks was evident. Id. Building B contained two hundred and twenty-five drums, three 25,000-gallon storage tanks, and a 65,000-gal-lon clarifier. Id. There was some evidence of leakage around the drums. Id. There was a large amount of spill cleanup debris located in the middle of the building. Id. Approximately one thousand drums of oil waste were located inside Building C. Id. at 3. Approximately fifteen of these drums appeared to be leaking. Id. The EPA investigation also revealed that the basement of Building A was contaminated with PCB’s and asbestos; storage tanks within the buildings were deteriorated and unsealed; three tankers containing organic materials were leaking; and the facility’s buildings were in a deteriorated state. Id. at 4.
*212 2. Time Period of Damage. This site operated from 1979 through 1986. Plaintiffs’ Site Statements, 33-58. Contamination was discovered after a September 1986 investigation by the EPA. Defendants’ Site Statements, 33-58.
3. UTC Involvement. Essex, a subsidiary of UTC, shipped waste to this site from 1980 to 1981. UTA, a subsidiary of UTC, shipped waste to this site from 1981 to 1983. Plaintiffs’ Site Statements, 33-58; Defendants’ Motion for Summary Judgment, Ex. 16
4. No Sudden and Accidental Discharge. UTC contends that the contamination at this site was caused by several accidental occurrences. Affidavit of Peter A. Gutermann, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 29. First, a fire occurred in June of 1983, when an employee accidentally added mislabelled waste powder to a truck load of paint waste. Id. Second, a ceiling collapsed in December of 1985 which caused the rupture of a tank and the release of three thousand gallons of ink solvent. Id. Third, another fire occurred on September 8, 1986, which initiated the EPA investigation. Id. UTC fails to draw any causal relationship between these accidental events and the contamination which was discovered at this site. UTC also ignores the fact that the EPA investigation identified leaking drums and storage tanks throughout the facility and observed that buildings on the site were in a decrepit condition. UTC offers no explanation for these conditions.
5. Pollution Exclusion. It is undisputed that Essex and UTA made shipments to the site between 1980 and 1983. Plaintiffs’ Site Statements, 33-58. Therefore, all shipments to this site were made after the 1970 implementation of the pollution exclusion clause in all relevant insurance policies. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that a series of accidental events caused the contamination at this site. Liberty Mutual has set forth facts which indicate that the contamination was due to the deterioration of drums of hazardous waste which were stored in dilapidated facilities. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, hazardous substances were stored in tanks and drums. The drums, stored in facilities in poor condition, deteriorated over time. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate on the grounds of the pollution exclusion clause.
Jadco-Hughes Site, Belmont, NC 34-59
This site is a chemical storage and recovery facility located in Belmont, North Carolina.
1. Site Operations. This six-acre site operated from 1971 to 1975. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 30, Tab D, “Record of Decision, Jadco-Hughes Site,” pg. 7. During its operation, the site reclaimed used waste paint and ink-type solvents. Id. Drummed chemicals were also stored on the site. Id. The State of North Carolina ordered the site to be closed in 1975 after numerous complaints by neighboring residents and the documentation of frequent spills. Id. By 1975, an estimated ten thousand 55-gal-lon drums had accumulated at the site. Id. at 11. These drums were stacked on top of one another. Many were rusted and leaking. Drums were left uncovered resulting in spills and overflows during rainstorms. Id. The site has been contaminated by substances including xylene, toluene, acetone, hextane, ethers, oils, hydraulic fluids, paints, solvents, and coolants. Id. at 12. Numerous spills and several fires were documented at the site during its years of operation. Id.
2. Time Period of Damage. Hazardous wastes were stored at this site from 1971 through 1975.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to the site from 1971 to 1975. Plaintiffs’ Site Statements, 34-59. On July 30, 1985, the EPA advised UTC and Inmont that they are potentially responsible parties in connection with the contamination at the Jadco-Hughes site. Id.; Plaintiffs’ Second Amended Complaint, pg. 59, para. 213-16.
4. No Pre-acquisition Coverage. It is undisputed that Inmont’s shipments to this site occurred between 1971 and 1975. Plaintiffs’ Site Statements, 34-59. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. Therefore, Inmont’s shipments to the Jadco-Hughes site occurred five years before it became a named insured of UTC. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
*213 5. Conclusion. Because all shipments by Inmont to the Jadco-Hughes site were made prior to Inmont’s acquisition by UTC there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate on pre-acquisition grounds.
Kin-Buc Landfill, Edison Township, NJ 37-61
The Kin-Buc Landfill consists of a number of individual disposal sites extending over a two-hundred— acre site in Edison Township, New Jersey.
1. Site Operations. The Kin-Buc Landfill began operations as early as 1947, as a municipal landfill. Affidavit of Gary S. Kull, Ex. 6, Tab A, “Superfund Record of Decision,” pg. 3. From 1971 to 1976, the site operated as a state-approved landfill for industrial and hazardous wastes. Id. During its period of operations, the landfill was utilized for disposal of municipal, industrial and hazardous waste. Id. Kin-Buc operated the site as a landfill from approximately 1968 to March of 1977. Id. Wastes that arrived at this site were buried on-site and then compacted with bulldozers. Id. at pg. 4. Tank trucks carrying liquid waste were discharged directly into a pit. Id. Once an active pit was filled, another one was opened. Id. These operational practices caused frequent major on-site fires and a number of serious occupational injuries. Id. The EPA asserts that this site has been contaminated by dozens of hazardous substances including oils, paints, cyanide, arsenic, lead, mercury, chloroform and chloride. Plaintiffs’ Second Amended Complaint, pg. 62, para. 225.
2. Time Period of Damage. The EPA estimates that at least seventy million gallons of liquid waste, including three million gallons of oily waste and over one million tons of solid waste were disposed of at this site between 1973 and 1976. Affidavit of Gary S. Kull, Ex. 6, Tab A, “Superfund Record of Decision,” pg. 2.
3. UTC Involvement Essex, Inmont, Otis, and Pratt & Whitney, all subsidiaries of UTC, sent waste to this site. Plaintiffs’ Second Amended Complaint, pg. 61, para. 224. Inmont shipped waste to this site from 1975 to 1976. Plaintiffs’ Site Statements, 37-61. There is insufficient information as to when waste was shipped to this site by Essex, Otis and Pratt & Whitney. Id. By letter dated January 11, 1984, the United States Environmental Protection Agency notified Essex, Inm-ont, Otis and Pratt & Whitney that they were all potentially responsible parties with respect to contamination at the Kin-Buc Site. Defendants’ Motion for Summary Judgment, Ex. 17. Further, Essex, Inmont, Otis and Pratt & Whitney were all named as defendants in lawsuits filed by citizens living adjacent to the Kin-Buc Landfill. Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 32, Tab C, E, F.
4. No Pre-acquisition Coverage — Inmont. It is undisputed that Inmont’s shipments to the Kin-Buc Landfill were made between 1975 and 1976. Plaintiffs’ Site Statements, 37-61. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. Therefore, Inmont did not become a named insured of UTC until four years after its last shipment to the site. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. No Sudden and Accidental Release. UTC contends that at least twelve major fires occurred at the Kin-Buc Landfill during its years of operation which contributed to the environmental contamination at the site. Affidavit of Azuwuike Ndukwu In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 32. However, here the EPA Record of Decision explicitly states that these fires were the result of pollution-prone “operational practices” at the site. Affidavit of Gary S. Kull, Ex. 6, Tab A, “Superfund, Record of Decision,” pg. 4.
6. Pollution Exclusion. The exact dates on which Essex, Otis and Pratt & Whitney dumped wastes at this site are unavailable. However, the Kin-Buc site was registered as a state-approved landfill for industrial wastes from 1971 to 1976. Affidavit of Gary S. Kull, Ex. 6, Tab A, “Superfund, Record of Decision,” pg. 3. The industrial waste shipments of Essex, Otis and Pratt & Whitney must have been made to this site during those years. Therefore, all relevant insurance policies were in effect after the 1970 implementation of the pollution exclusion clause. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination at this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination was caused by fire. Liberty Mutual has set forth facts which indicate that the contamination at this site was due to pollution-prone operating practices. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. The Kin-Buc site was operated as a landfill for hazardous substances. Hazardous substances were directly dumped into unlined pits. Millions of gallons of wastes were disposed of in this manner. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner would directly result in contamination to the environment. It is therefore unlikely that UTC will be able to produce sufficient evidence at trial to cany their burden of demonstrating that the contamination *214 of this site was caused by a sudden and accidental event.
7. Conclusion. Because all shipments by Inmont to the Kin-Buc Landfill were made prior to Inmont’s acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site attributable to Inmont’s shipments. In addition, because the release of contaminants at this site cannot be deemed to have been sudden and accidental there is no insurance coverage for environmental contamination at this site, under the main body of the Liberty Mutual insurance policies, which may be attributable to shipments made by Essex, Otis and Pratt & Whitney. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, summary judgment in favor of Liberty Mutual in regards to Inmont is appropriate on pre-acquisition grounds. In addition, partial summaryjudgment in regards to Essex, Otis and Pratt & Whitney is also appropriate on pollution exclusion grounds.
Liquid Disposal Site, Shelby Township, MI 40-65
Liquid Disposal, Inc. is located on a six-acre site in Utica, Michigan.
1. Site Operations. Liquid Disposal, Inc. began operations in 1968, as a commercial incinerator of liquid waste. Affidavit of Gary S. Kull, Ex. 39, “Recycling and Treatment Facilities,” Tab A, “Record of Decision,” pg. 1. The site was closed in January 1982 after two workers were killed in an industrial accident. Id. Just prior to the accident, the site contained a large volume of hazardous substances stored in a waste lagoon, above- and below-ground storage tanks, and fifty-five gallon drums. Id. The site also contained a high temperature incinerator and a water lagoon. Id. Between 1982 and 1986, the United States Environmental Protection Agency completed four removal actions. Id. These actions included the recovery of oil and contaminated soil from a waste liquid lagoon; the construction of a leachate collection system; the removal of approximately fifteen thousand cubic yards of solids and 1,800 drums of waste; and the off-site incineration of flammable liquids and sludges removed from twenty-two above-ground and eight below-ground storage tanks. Id.
2. Time Period of Damage. This facility began operations in 1968 and was closed in 1982. UTC contends that the contamination of this site occurred in 1982. Affidavit of Antonio B. Braz, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 35.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site from 1971 to 1981. Plaintiffs’ Site Statements, 40-65. On May 17,1985, on April 22, 1987, and again onAugust21, 1987, the EPAadvised Inmont that it is a potentially responsible party (PRP) in connection with contamination at the site. Id. The parties dispute the relevant dates of shipments to the site by Essex. UTC asserts that “(EJssex has been identified by the EPA as having shipped . . . waste to the Liquid Disposal Site during the period from 1968 to 1982.” Plaintiffs’ Second Amended Complaint, para. 239, pg. 66. However, UTC fails to provide the court with any documentation in support of this claim. UTC appears to rely upon the PRP letter from the EPA to Essex. Affidavit of Antonio B. Braz, In Support of Plaintiffs Opposition to the Dismissal of the Non-New England Sites, Ex 35, Tab A. However, this letter only requests documents from Essex between the years of 1968 and 1982, the years of operation of Liquid Disposal, Inc. Id. The defendants submit documentation which supports their assertion that the only shipments of Essex to liquid Disposal were made in 1981. Defendants’ Motion for Summary Judgment, Ex. 18. Since UTC has failed to set forth any facts which indicate that shipments to Liquid Disposal began in 1968, the court will proceed on the assumption that Essex’s only shipments to the Liquid Disposal site occurred in 1981.
4. No Sudden and Accidental Discharge. UTC contends that the contamination at this site was caused when two hundred gallons of PCB-contaminated oil accidentally spilled from a waste lagoon. Affidavit of Antonio B. Braz, In Support of Plaintiffs Opposition to Dismissal of Non-New England Sites, Ex. 35. However, even assuming that the release of contaminants stored in a facility such as a waste lagoon can be considered accidental, the plaintiffs admit that only PCB-contaminated oil was released from the lagoon. The plaintiffs’ own complaint alleges that:
[a]ir, soil, surface and groundwater at the site have been contaminated by substances . . . including PCB-contaminated oil, dioxin, toluene, chromium, manganese, pesticides, gasoline, paints and solvents.
Plaintiffs’ Second Amended Complaint, para. 237 pg. 65. UTC offers no explanation as to how this site became contaminated by dioxin, toluene, chromium, pesticides, gasoline paints and solvents.
5. Pollution Exclusion. All relevant shipments to the Liquid Disposal site were made between 1971 and 1981. Defendants’ Site Statements, 40-65. Since all shipments were made after 1970, the pollution exclusion clause applies and coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that contamination resulted when PCB-contaminated oil accidentally spilled from a lagoon. Liberty Mutual has set forth facts which indicate *215 that the contamination of this site was due to the release of contaminants from a lagoon, and leaking drum and storage tanks. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Liquid Disposal, Inc. was in the business of storing hazardous wastes. It is not beyond the long range expectations of UTC that hazardous substances stored in this maimer could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate on the grounds of the pollution exclusion clause.
Maryland Sand, Gravel & Stone, Elkton, MD 44-68
The Maryland Sand, Gravel, and Stone site is located on two hundred acres in Elkton, Maryland.
1. Site Operations. This site was originally operated as a sand and gravel quarry. Affidavit of Gary S. Kull, Ex. 9, “Landfills,” Tab A, “EPA Record of Decision,” pg. 4. Between 1969 and 1974, about three acres on this site was used for the disposal of waste processing water, sludge, and still-bottoms. Id. Approximately seven hundred thousand gallons of waste was dumped at this site into several open pits. id. On April 27, 1974, a fire occurred during which a pool of chemical waste burned at high intensity. Id. In 1974, two hundred thousand gallons of liquid waste was removed from the site and transported to the Kin-Buc Landfill in Edison, New Jersey. Id. Drums and sludges that remained were buried. Id. The EPA alleges that this site is contaminated by many substances including trichloroethane, phenol, aniline, chlorinated solvents and hydrocarbons. Plaintiffs’ Second Amended Complaint, pg. 69, para. 249.
2. Time Period of Damage. The site was used for the disposal of waste between 1969 and 1974.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site. Plaintiffs’ Site Statements, 44-68. Exact dates of shipment are unknown. Id. However, dumping at this site ceased in 1974. Id. On June 6,1986, Inmont received a letter from the United States Environmental Protection Agency designating Inmont as a potentially responsible party in connection with contamination at the Maiyland Sand & Gravel site. Plaintiffs’ Second Amended Complaint, pg. 68, para. 248-50; Affidavit of Antonio B. Braz, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 39.
4. No Pre-acquisition Coverage. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier became a named insured under the Liberty Mutual policies on November 1, 1980. It is undisputed that the Maryland Sand & Gravel Landfill ceased operations in 1974. Plaintiffs’ Site Statements, 44-68. Therefore, Inmont did not become a named insured of UTC until six years after its last shipment to the site. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. Conclusion. Because Inmont’s deliveries to the Maryland Sand & Gravel Landfill occurred prior to its acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for Inmont’s pre-ac-quisition activities. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Maxey Flats Nuclear Disposal Site, Fleming County, KY 45-69
This site is a low-level nuclear waste disposal site located on a two hundred and eighty-acre site in Fleming County, Kentucky.
1. Site Operations. This site was licensed by the Commonwealth of Kentucky to accept low-level radioactive waste from 1963 through 1977. Affidavit of Gary S. Kull, Ex. 10, “Landfills,” Tab A, “EPA Administrative Order By Consent,” pg. 2-3. Nuclear and other hazardous wastes, such as benzene, toluene, naphthalene and dichloroethane, were received and dumped in forty-six trenches, approximately three hundred and sixty feet long, seventy feet wide and twenty feet deep. Id. Over four million cubic feet of waste was deposited at this site in this manner. Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 40, Tab A. An EPA inspection in 1986 revealed elevated levels of radioactive contamination that was in danger of migrating off-site. Id.
2. Time Period of Damage. This site accepted nuclear waste and other hazardous materials from 1963 through 1977.
3. UTC Involvement Hamilton Standard Division (HSD), a subsidiary of UTC since 1934, shipped waste to this site in 1968. Plaintiffs’ Site Statements, 45-69. Sikorsky Aircraft, a subsidiary of UTC since 1929, shipped waste to the site in 1971. Id. On December 3, 1986, the EPA advised HSD and Sikorsky that they are potentially responsible parties in connection with environmental contamination at the Site. Plaintiffs’ Second Amended Complaint, pg. 69, para. 251-55. On June 1, 1987, HSD and Sikorsky entered into an *216 administrative consent order with the EPA regarding remediation of the contamination at this Site. Affidavit of Gary S. Kull, Ex. 10, “Landfills,” Tab A, “EPA Administrative Order By Consent.”
4. No Sudden and Accidental Release. The contamination at this site was caused by the dumping of radioactive and other hazardous wastes directly into open trenches. Id. pg. 2-3. UTC does not allege that the contamination at this site was caused by any “sudden and accidental” event.
5. Pollution Exclusion. It is undisputed that Sikorsky shipped waste to this site in 1971. Plaintiffs’ Site Statements, 45-69. Since all of Sikorsky’s shipments to this site were made after the 1970 implementation of the pollution exclusion clause, coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. The defendants have set forth facts which indicate that the contamination of the Maxey Flats Nuclear Disposal site was due to the intentional dumping of radioactive and other hazardous substances into open trenches. Faced with a showing that coverage is precluded by the pollution exclusion clause, the plaintiffs have the burden of producing countervailing materials demonstrating that the polluting event was sudden and accidental in order to avoid summary judgment. Since it is unlikely that the plaintiffs will be able to produce sufficient evidence at trial to carry their burden, Liberty Mutual is entitled to summary judgment.
6. All HSD Shipments Were Made Prior to 1970. It is also undisputed that HSD made shipments to the Maxey Flats Nuclear Disposal site in May 1968. Plaintiffs’ Site Statements, 45-69. The pollution exclusion clause was not implemented into applicable UTC insurance policies until 1970. Therefore, the pollution exclusion clause does not bar coverage for the environmental contamination at this site that may have been caused by HSD prior to 1970. For this reason, Liberty Mutual is not entitled to summary judgment in regards to shipments made to this site by HSD.
7. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental the pollution exclusion clause precludes insurance coverage under the main body of the policies for environmental contamination that may have been caused by Sikorsky’s shipments to this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, Liberty Mutual is entitled to partial summary judgment in regards to all shipments made by Sikorsky on the grounds of the pollution exclusion clause. However, shipments by HSD were made to this site prior to the 1970 implementation of the pollution exclusion clause. Liberty Mutual is not entitled to summary judgment for shipments made to the site by HSD prior to 1970. For these reasons, summary judgment is granted in part and denied in part.
Metamora Landfill, Metamora, MI 47-71
The Metamora Landfill occupies a one-hundred- and-sixty — acre site in Metamora, Michigan.
1. Site Operations. The Metamora Landfill was in operation from 1966 to 1979. Plaintiffs’ Site Statements, 47-71. Both municipal and industrial chemical wastes were disposed of at this site. Affidavit of Carol A. Kelly, Ex. 9, Tab A, “Metamora Landfill Feasibility Study," pg. 3. Wastes were hauled to this site, deposited directly into the landfill and then covered with soil. Id. The Michigan Department of Natural Resources has concluded that the Metamora Landfill is contaminated by substances including arsenic, cadmium, chloroform, dichloroethane, lead, methylene chloride and tetrachloroethylene. Plaintiffs’ Second Amended Complaint, pg. 71-72, para. 258-60.
2. Time Period of Damage. The Metamora Landfill accepted wastes between 1966 and 1979.
3. UTC Involvement Inmont and Alma Plastics, two subsidiaries of UTC, both shipped waste to this site. Plaintiffs’ Site Statements, 47-71. UTC contends that there is insufficient information regarding shipment dates. Plaintiffs’ Site Statements, 47-71. However, the facility ceased operations in 1979. Id. On December 12, 1989, the EPA advised Inmont that is a potentially responsible party in connection with environmental contamination at the Metamora Landfill. Plaintiffs’ Second Amended Complaint, pg. 71, para. 258-60. On February 20, 1990, the EPA requested information from Alma Plastics regarding their involvement at the site. Affidavit of Antonio Braz, In Support of Plaintiffs’ Motion in Opposition to Dismissal of Non-New England Sites, Ex. 42, Tab B. “EPA Letter of Feb. 20, 1990.”
4. No Suit — Alma Plastics. The relevant language of the insurance policies at issue provides that Liberty Mutual shall defend any suit against the insured alleging injuiy and seeking damages. Here, there is no allegation that any party has brought suit, or its functional equivalent against Alma Plastics. See Hazen Paper, 407 Mass. 689, 694-95 (1990). The EPA sent Alma Plastics a request for information on February 20, 1990. Affidavit of Antonio Braz, In Support of Plaintiffs’ Motion in Opposition to Dismissal of Non-New England Sites, Ex. 42, Tab B. “EPA Letter of Feb 20, 1990.” Such a request is not the functional equivalent of a suit.
5. No Pre-acquisition Coverage — Inmont. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. Although UTC contends that the dates of Inmont’s shipments to the Site are unavailable, the Site was closed in 1979. Therefore, any shipments made by Inmont to the Metamora Landfill were made prior to its acquisition by UTC. Similarly, Alma Plastics was acquired by United Technologies Automotive, a subsidiary of UTC, in Decern- *217 ber of 1984. Alma Plastics became a named insured of UTC, under the Liberty Mutual policies, on December 31, 1984. All shipments of Alma Plastics to the Metamora Landfill were also made well before Alma Plastics became a named insured of UTC. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of a subsidiary’s activities prior to the date on which that subsidiary became a named insured under the relevant policies.
6. Conclusion. In the absence of a suit against Alma Plastics, summaiyjudgment in favor of Liberty Mutual is appropriate. In addition, because all deliveries by Inmont and Alma Plastics were made to the Metamora Landfill prior to their acquisition by UTC, Liberty Mutual is not obligated to provide insurance coverage for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Northside Sanitary Landfill, Zionsville, IN 54-78
The Northside Sanitary Landfill site is located in Zionsville, Indiana and is located adjacent to Enviro-Chem, Inc., an oil waste reclamation center discussed infra.
1.Site Operations. The Northside Sanitary Landfill operated a hazardous waste landfill at this site from 1955 to 1987. Affidavit of Gary S. Kull, Ex. 34, “Recycling and Treatment Facilities,” Tab A, “Record of Decision,” pg. 7. Between 1972 to 1973, operational deficiencies at the Northside Landfill were reported to the Indiana State Board of Health. Id. These deficiencies included the failure to cover refuse, surface burning, underground fires, leachate and vermin problems. Id. In June of 1972 and December of 1973, the Indiana State Board of Health ordered the owner of the Northside Landfill to cease operations. Id. Operations continued into early 1974, which resulted in the State issuing a complaint ordering operations to cease. Id. In February of 1975, a permit was issued to reopen the Landfill. Id. In March and September of 1978, the Indiana State Board of Health noted that unapproved wastes were disposed of at this site including paint sludges, acids, spent acids and waste oil. Id. By 1981, the Northside Sanitary Landfill had accepted at least sixteen million gallons of hazardous substances. Id. In July 1982, Northside’s application for a permit to operate as a hazardous waste landfill was refused because groundwater contamination was discovered on the property. Id. In April of 1983, Northside’s hazardous waste operating permit was again denied because of deficiencies in its closure, post-closure and ground-water assessing plans. Id. at pg. 8. As of April 1987, the Northside Sanitary Landfill was continuing to operate as a solid waste landfill. Id. An investigation by the Environmental Protection Agency in 1987 revealed contamination of the subsurface soil, surface water and sediment, leachate and ground water on the site by hazardous substances, including paint sludges, acids, chlorinated hydrocarbons, waste oils, toxic metal compounds and pesticides. Plaintiffs’ Second Amended Complaint, pg. 78, para. 282-83.
2. Time Period of Damage. The Northside Sanitary Landfill operated as a hazardous waste landfill from 1955 through 1987.
3. UTC Involvement. Essex, Inmont and UTA, all subsidiaries of UTC, shipped wastes to the Northside Sanitary Landfill. Plaintiffs’ Site Statements, 54-78. However, the actual dates of shipment are unknown. Id.; Defendants’ Motion for Summary Judgment, Ex. 19. On January 28, 1987, the United States Department of Justice and the EPA jointly informed Inmont and Essex that they are potentially responsible parties in connection with contamination at the Northside Landfill. Plaintiffs’ Second Amended Complaint, pg. 78, para. 282-83; Plaintiffs Affidavit of Azuwuike Ndukwu, In Support of Opposition to Dismissal of the Non-New England Sites, Ex. 48. On January 25,1987, UTA received a PRP letter from the EPA. Plaintiffs’ Site Statements, 54-78.
4. No Sudden and Accidental Discharge. UTC contends that the contamination at this site was caused by the accidental release of hazardous substances from storage tanks. Affidavit of Azuwuike Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 48. UTC asserts that it is possible that this release was caused by vandals. Id. However, the EPA Record of Decision for this site describes a pattern of improper and illegal disposal practices over an extended period of years. Affidavit of Gary S. Kull, Ex. 34, “Recycling and Treatment Facilities,” Tab A, pg. 7-8. The Record of Decision describes numerous operational deficiencies and violations of the Indiana Environmental Act, including the acceptance of unapproved wastes. Id. The Record of Decision further states that by 1981, the landfill had received at least sixteen million gallons of hazardous substances. Id.
5. Pollution Exclusion. The dates on which Essex and Inmont shipped wastes to the Northside Landfill are not known. However, UTC did not purchase Essex until 1974. Inmont was not purchased until 1979. Therefore, any shipments of Essex and Inmont to this site were made after they became subsidiaries of UTC and after the 1970 implementation of the pollution exclusion clause into all relevant insurance policies. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination at this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that vandalism caused the abrupt release of contaminants from storage tanks at this site. Liberty Mutual has brought forth facts which indicate that the contamination at this site was due to *218 pollution-prone operating practices. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, over sixteen million gallons of hazardous substances were dumped at this site over a period of many years. Hazardous substances were directly dumped into an on-site landfill. In addition, the Northside Landfill was repeatedly cited for disposal practices in violation of the law. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner would directly result in contamination. It is therefore unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate.
Poer Farm Site, Hancock County, IN 58-81
The Poer Farm is located on a four-and-a-half — acre tract in Hancock County, Indiana.
1. Site Operations. Inmont shipped paint and resin materials to this site in 1973. Affidavit of Gary S. Kull “Storage Facilities” Ex. 24, Tab A, “EPA Record of Decision, Norman Poer Farm Site,” pg. 1. The owner of the site was to blend the wastes into low quality bridge paint. Id. The project was abandoned when no market was found for the product. Id. Approximately two hundred and sixty drums were left stockpiled on the property. Id. In August of 1981, the Hancock County Health Department requested cleanup assistance from the State Fire Marshall because of the potential fire hazard posed by the stockpiled materials. Id. The Indiana State Board of Health visited the site in October 1981 to collect samples of the drums’ contents. Id. Samples showed high concentrations of heavy metals. Id. Between 1981 and 1984, the Indiana State Board of Health performed a well survey on and around the Poer Farm. Id. Although none of the residential wells in the vicinity of the Poer Farm exceeded primary drinking water standards, an open well on the Poer Farm exceeded water quality standards for arsenic, cadmium, lead and mercury. Id. at 2. These elevated levels may have been due to vandalism as paint cans were found in the well. Id. A site assessment was conducted by the EPA in June and July of 1983. Id. The investigation revealed that two hundred and sixty 55-gallon drums were stored on the site. Id. Some of the drums showed signs of leakage. Id. The EPA removed the drums from the site. Id. Defendants’ Motion for Summary Judgment, Ex. 65.
2. Time Period of Damage. Paint and resin materials were delivered to this site in fifty-five gallon drums in 1973. All wastes were removed in 1983 after the site was abandoned. Affidavit of Gary S. Kull, Ex. 24, “Storage Facilities.”
3. UTC Involvement. Inmont, a subsidiary of UTC, shipped off-grade paint and paint resin materials to the Poer farm site during 1973-1974. On April 19, 1984, the EPA advised Inmont that the wastes at the Poer Farm Site had been removed and named Inmont as a responsible party in connection with environmental contamination at the site. Plaintiffs’ Second Amended Complaint, pg. 81, para. 296-99.
4. No Pre-acquisition Coverage. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Camer became a named insured under the Liberty Mutual policy on November 1, 1980. It is undisputed that Inmont’s deliveries to the Poer Farm Site occurred between 1973 and 1974. Plaintiffs’ Second Amended Complaint, pg. 81, para. 296-99. Therefore, Inmont did not become a named insured of UTC until six years after its last shipment to the Poer Farm site. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. Conclusion. Because Inmont’s deliveries to the Poer Farm site occurred during 1973-1974, prior to Inmont’s acquisition by UTC, there is no coverage under the policies for Inmont’s pre-acquisition activities. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Quanta Resources Site, Syracuse, NY 60-83
The Quanta Resources site is an abandoned waste oil processing facility located on one acre in Syracuse, New York.
1. Site Operations. The Quanta Resources Site was operated by various corporate entities from the 1920s through the early 1980s as an oil processing facility. Affidavit of Robert A. Argazzi, In Support of Plaintiffs Response In Opposition to Dismissal of Non-New England Sites, Ex, 53, Tab B. “Action Memorandum,” pg. 2. In 1980, Quanta Resources, Inc. took over operations at the site. Id. The facility consists of fifty-two above-ground storage tanks with capacities ranging from 225 to 35,000 gallons, four underground storage tanks with capacities of 10,000 to 22,000 gallons and two below-ground sumps. Id. The tanks contained PCB’s, sludge, oil/water mixtures, acids and caustics. Id. Quanta Resources quickly went bankrupt and the facility was abandoned in 1981. Id. at pg. 3. Since then, the site has been the subject of numerous spills resulting from vandalism and the poor condition of tanks, feed lines and piping systems. Id. Frequent fires *219 have also been reported at the site. Id. A 1990 inspection by the United States Environmental Protection Agency revealed that the majority of the tanks on the site were in poor condition. Id. Two storage tanks contained incompatible wastes. Id. Four tanks containing waste were improperly constructed. Id. Several tanks had rusted tops and sidewalls and in some cases, portions of the tanks were completely corroded. Id. The poor condition of the tanks was confirmed by previous spills documented by the New York State Department of Environmental Conservation. Id. Evidence of contamination included waste oil residue on most floors and standing oil in several areas. Id. Soils at the site showed material spillage and contamination by substances including methylnapthalene, naphthalene, dichloroethane, tetrachloroethane, toluene, eth-ylbenzene, xylene, barium, lead, chromium, strontium, PCB’s and asbestos. Id. Plaintiffs’ Second Amended Complaint, para. 304-05, pg. 83; Affidavit of Gary S. Kull, Ex. 41, “Recycling and Treatment Facilities.”
2. Time Period of Damage. This site operated as an oil processing facility from 1920 through 1981 when the site was abandoned. Contamination was discovered in 1990 after the EPA began its investigation.
3. UTC Involvement. Pratt & Whitney, a subsidiary of UTC, shipped waste to this site from 1973 through October3,1979. OnAugust21,1990, theEPAadvised Pratt & Whitney that it is a potentially responsible party in connection with environmental contamination at the Quanta Resources site. Plaintiffs’ Site Statement, 60-83; Plaintiffs’ Second Amended Complaint, para 304-05, pg. 83.
4. No Sudden and Accidental Discharge. UTC fails to assert that the pollution at this site was due to any sudden and accidental event. UTC does mention that the site has experienced numerous spills and fires but acknowledges that the site was intentionally abandoned by its owners. Affidavit of Robert A. Argazzi, In Support of Plaintiffs Response In Opposition to Dismissal of the Non-New England Sites, Ex. 53. The EPA Action Memorandum in regards to this site explicitly indicates that the spills of hazardous substances are attributable to “vandalism and the poor condition of the tanks, feed lines and complex piping systems.” Id. at Tab B, “Action Memorandum,” pg. 3.
5. Pollution Exclusion. It is undisputed that Pratt & Whitney shipped waste to this site from 1973 through October 3, 1979. Plaintiffs’ Site Statement, 60-83. Since all shipments were made after the 1970 implementation of the pollution exclusion clause, coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual, pollution which occurred as a part of daily business operations.
UTC seems to assert that the contamination of this site was caused by accidental fires and spills. Liberty Mutual has brought forth facts which indicate that the contamination of this site was due to the abandonment of this facility and the gradual deterioration of drums and storage tanks containing hazardous waste. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred.
Here, hazardous wastes stored in corroding drums and storage tanks were intentionally abandoned. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). It is not beyond the long range expectations of UTC that hazardous substances stored in this manner could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate on the grounds of the pollution exclusion clause.
Rock Hill Chemical Site, Rock Hill, SC 63-85
The Rock Hill Chemical Company is located in Rock Hill, South Carolina.
1. Site Operations. Rock Hill Chemical operated a solvent distillations facility at this site from 1960-1965. Plaintiffs’ Site Statements, 63-85. The company distilled paint solvents and recovered textile dye products. Defendants’ Site Statements, 63-85. Hazardous substances were also disposed of at this facility in large storage tanks. Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 56, Tab C, “EPA Order,” pg. 2. An investigation by the United States Environmental Protection Agency in 1985 revealed that a storage tank containing oil contaminated with methylene chloride was leaking. Id. In addition, several tanks were open on top exposed to the elements and to the public. Id. A groundwater well on the premises was found to be contaminated with dichloroethane. Id. The facility was abandoned after a fire around 1965. Defendants’ Site Statements, 63-85. UTC contends that this fire was the cause of the release of contaminants into the environment. Affidavit of William F. *220 Leikin, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 56.
2. Time Period of Damage. This site was in operation from 1960-1965. Contamination at the site was discovered by a EPA investigation in 1985.
3. UTC Involvement. Inmont, a subsidiary of UTC, shipped methyl-ethyl ketone-based printing ink solvents, toluene-based solvents and alcohol-based solvents to this site. Defendants’ Site Statements, 63-85. On March 18, 1986, Inmont received a letter from the South Carolina Department of Health and Environmental Control designating Inmont as a potentially responsible party (PRP) in connection with contamination at the Rock Hill Site. Affidavit of William F. Leikin, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 56. On October 1, 1986, Inmont received a letter from the United States Environmental Protection Agency designating Inmont as a PRP for contamination at the site. Id. On December 30, 1986, the EPA issued an Administrative Order requiring Inmont to participate in the clean up of the Rock Hill Site. Id. Finally, on June 29, 1989, Inmont was named as a defendant in a lawsuit concerning the environmental contamination of this site. Id.; Plaintiffs’ Second Amended Complaint pg. 85-86 para 314-16.
4. No Pre-acquisition Coverage. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier became a named insured under the Liberty Mutual policies on November 1, 1980. It is undisputed that the Rock Hill Chemical Site was only in operation from 1960 to 1965, and that all shipments of waste by Inmont to the site were made during this time period. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. Conclusion. Because Inmont’s deliveries to the site occurred between 1960 and 1965, many years prior to Inmont’s acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Royal Hardage Site, Criner, OK 67-89
The Royal Hardage Site is a waste disposal site located in McClain County, Oklahoma.
1.Site Operations. From 1972 through 1980, over twenty million gallons of waste were transported to the site for storage and disposal. Affidavit of Gary S. Kull, Ex. 16, "Landfills,” Tab A, United States of America v. Royal M. Hardage, et al., pg. 12. Wastes were dumped into two large unlined, unsealed pits. Id. The site accepted oil recycling wastes, acids, caustics, lead, cyanide, arsenic, pesticides, PCB’s and other substances. Id. In 1979, the State Department of Health began proceedings to revoke the facility’s permit due to the unauthorized use of storage pits, the failure to seal the pits, the failure to retain runoff, and improper storage of wastes. Affidavit of Gary S. Kull, Ex. 16 “Landfills.” In 1979, EPA inspections and investigations at the site indicated that poor waste management practices posed threats to public health, welfare and the environment. Id.
2. Time Period of Damage. This site was in operation from 1972 to 1980. During that time, over twenty million gallons of waste were shipped to this site and dumped into large unlined pits.
3. UTC Involvement. Mostek, Inc., a subsidiary of UTC, shipped hydrofluoric acid and acid sludge to the Royal Hardage site in April of 1974, on March 29, 1979, and on July 21, 1979. Plaintiffs’ Site Statements, 67-89. On June 6,1989, the United States filed an amended complaint against a number of defendants in connection with contamination at the site. Affidavit of Peter A. Gutermann, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 60, Tab A. On June 8, 1989, Mostek, now named CTU, was joined in this action as a third-party defendant. Id.
4. No Pre-acquisition Coverage. UTC acquired Mostek in November of 1979. Mostek became a named insured under the Liberty Mutual policies on July 1, 1980. It is undisputed that the last Mostek delivery to the Royal Hardage Site occurred on July 21, 1979, approximately one year before Mostek became a named insured of UTC. Plaintiffs’ Site Statements, 67-89. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Mostek’s activities prior to the date on which Mostek became a named insured of UTC.
5. Conclusion. Because Mostek’s deliveries to the Royal Hardage Site occurred in 1974 and 1979, prior to Mostek’s acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Saad Waste Oil, Nashville, TN 68-90
Saad Waste Oil, Inc. is a waste oil disposal and recycling facility located on a one-half — acre site in Nashville, Tennessee.
1. Site Operations. From 1971 to 1980, the site was operated by John P. Saad & Sons. Affidavit of Gary S. Kull, Ex. 43, “Recycling and Treatment Facilities,” Tab A, “Site Narrative, Saad Waste Oil,” pg. A33. During these years, it is estimated that over one million gallons of waste were transported to the site by tank truck. Id. at pg. A34. The waste was then placed in two ground-mounted storage tanks from which it was then sold. Defendants’ Site Statements, 68-90. Sediment in the tanks was periodically drained and dumped on the property. Id. Waste sediment was also mixed with oil *221 and sprayed over dirt roads. Id. In 1981, John P. Saad & Sons, Inc. was dissolved and the wastes at the site were abandoned. Affidavit of Gary S. Kull, Ex. 43, “Recycling and Treatment Facilities,” Tab A, “Site Narrative, Saad Waste Oil,” pg. A33. In 1989, an EPA investigation found contamination in soil, nearby springs and groundwater. Id. Waste was found in exposed and in buried drums, in three above-ground storage tanks, in two underground storage tanks and in open sumps. Contaminants found at the site include trichloroethylene, methylene chloride and dichloroethane. Id.; Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 61, Tab A, “EPA Notice of Potential Liability.”
2. Time Period of Damage. This facility was in operation from 1971 to 1980. It was abandoned in 1981. Contamination was discovered after an EPA investigation in 1989.
3. UTC Involvement. Essex, a subsidiary of UTC, shipped waste to this site between 1971 and 1980. Exact dates are not known. Plaintiffs’ Site Statements, 68-90. On January 25, 1990, the EPA advised Essex that it is a potentially responsible party with respect to contamination at the site. Plaintiffs’ Second Amended Complaint, pg. 90 para. 332-34.
4. No Sudden and Accidental Discharge. UTC asserts that “[IJnformation obtained from engineering and environmental studies prepared by consultants for the EPA indicates that a ground/water/oil separator at the Saad Site ruptured abruptly, possibly as a result of vandalism, contributing to the environmental contamination at the site.” Affidavit of Azuwuike H. Ndukwu, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 61. UTC fails to attach these studies to their affidavit. However, even accepting as true that a rupture of an oil/water separator caused some contamination, the fact remains that this site was contaminated by substances including carbon tetrachloride, methylene chloride, toluene, tetrachloroethylene, trichloroethane, trichloroethyl-ene and xylene. UTC offers no explanation as to how this site became contaminated by these substances. This site operated for nine years as a recycling and treatment facility for hazardous wastes. Over a million gallons of hazardous substances was stored here in drums, storage tanks and open sumps. Waste sediments were intentionally dumped directly onto the property. In 1981, the site was intentionally abandoned. None of the hazardous substances stored at this site were removed.
5. Pollution Exclusion. It is undisputed that Essex shipped waste to this site sometime between 1971 and 1980. Plaintiffs’ Site Statements, 68-90. Since all shipments were made after the 1970 implementation of the pollution exclusion clause, coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. To avoid the pollution exclusion clause UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination at this site was caused by the rupture of a water/oil separator. Liberty Mutual has set forth facts which indicate that the contamination of this site was due to the dumping of wastes directly onto the property and to improper disposal practices. Further, Liberty Mutual asserts that contamination resulted after the site was intentionally abandoned and none of the hazardous substances were removed. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, hazardous wastes were deliberately dumped onto the property and waste sediment was intentionally mixed with oil and sprayed over dirt roads. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). It is not beyond the long range expectations of UTC that hazardous substances stored in this manner could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the Liberty Mutual policies at issue for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment in favor of Liberty Mutual is appropriate.
Sante Fe Springs I Site, Sante Fe Springs, CA 71-92
This site, located on Marquardt Avenue in Sante Fe Springs, California, operated as an unpermitted storage facility of hazardous wastes.
1. Site Operations. Frank Stankevich, d/b/a General Disposal, Inc., operated this site from the 1950s through 1982. Plaintiffs’ Site Statements, 71-92. During this period, approximately fifteen thousand 55-gal-lon drums of hazardous wastes and chemicals were accumulated at the site. Defendants’ Site Statements, 71-92. In 1978, Stankevich was cited for operating without waste disposal and storage permits. Id. On May 6, 1981, the California Department of Human Services (CADHS) brought suit in regards to the contamination at this site. Plaintiffs’ Site Statements, 71-92. The suit alleged that a release of hazardous *222 substances had occurred. Id. In July 1981, a fire and explosion occurred at the site. Defendants’ Site Statements, 71-92. In July 1982, area residents filed suit alleging that the -fire and explosion were the result of the operating practices of the site. Plaintiffs’ Affidavit of William F. Leikin, In Support of Opposition to Dismissal of Non-New England Sites, Ex. 64.
2. Time Period of Damage. Hazardous wastes were accepted at this site from the 1950s through 1982.
3. UTC Involvement Inmont, a subsidiary of UTC, shipped waste to this site from 1968 through March of 1980, when the site was closed. Defendants’ Site Statements, 71-92. On July 31, 1981, the EPA notified Inmont that they are a potentially responsible party in connection with contamination at the site. Plaintiffs’ Affidavit of William F. Leikin, In Support of Opposition to Dismissal of Non-New England Sites, Ex. 64, Tab C, “EPA, PRP Letter.” Inmont was also named as a defendant in the suit brought by the CADHS against General Disposal, Inc. Plaintiffs’ Site Statements, 71-92; Plaintiffs’ Affidavit of William F. Leikin, In Support of Opposition to Dismissal of Non-New England Sites, Ex. 64, Tab B. State of California v. Frank J. Stankevich, Sr. et al.
4. No Pre-acquisition Coverage. All shipments by Inmont to the Sante Fe Springs site were made prior to March of 1980. Defendants’ Site Statements, 71-92. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of Inmont’s activities prior to the date on which Inmont became a named insured of UTC.
5. Conclusion. Because all deliveries by Inmont to the Sante Fe Springs Site were made prior to Inmont’s acquisition by UTC, there is no insurance coverage under the Liberty Mutual policies for environmental contamination of this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Seymour Recycling Site, Seymour, IN 76-97
The Seymour Recycling Corporation is located two miles outside of Seymour, Indiana on a fourteen-acre site.
1.Site Operations. The Seymour Recycling Corporation (SRC) processed, stored and incinerated chemical wastes at this site from 1970 until early 1980. Affidavit of Gary S. Kull, Ex. 46 “Recycling and Treatment Facilities,” Tab A, “EPA Record of Decision.” The site was closed when SRC failed to comply with a 1978 agreement with the State of Indiana to cease receiving wastes and to institute better waste management practices. Id. In 1980, the EPA fenced off the site to restrict access and constructed dikes to control runoff from the site. Id. Between December of 1982, and January of 1984, approximately fifty thousand drums and one hundred storage tanks, all containing hazardous wastes, were removed and properly disposed of. Id. In addition, the top foot of contaminated soil was removed from approximately seventy-five percent of the surface of the fourteen-acre site. Id.
2. Time Period of Damage. This site began accepting hazardous substances in 1970 and was closed by the EPA in 1980.
3. UTC Involvement. Essex, Otis, and Inmont, all subsidiaries of UTC, shipped wastes to this site. Plaintiffs’ Site Statements, 76-97. Otis shipped waste from July 1970 to November 1975. Id. Essex shipped waste from April 16, 1970 until December 18, 1970. Id. Inmont shipped waste from April 9, 1970 until August 25, 1977. Id. On May 9, 1980, the United States filed suit against UTC alleging that Essex, Inmont, and Otis were liable for cleanup costs incurred at the Seymour Recycling site. Id.
4. No Pre-acquisition Coverage. All shipments made by Essex, Otis and Inmont to the Seymour Recycling site were made before these corporations became subsidiaries of UTC. Otis shipped waste to the site from July 1970, to November 1975. Defendants’ Site Statements, 76-97. Otis became a named insured of UTC under the Liberty Mutual policies on January 1, 1977. Id. Essex shipped waste to the Seymour site from April 16, 1970, until December 18, 1970. Id. Essex became a named insured of UTC under the Liberty Mutual policies on July 1, 1974. Inmont shipped waste to the site from April 9, 1970 until August 25, 1977. Id. Inmont became a named insured of UTC under the Liberty Mutual policies on November 1, 1980. As a matter of law, Liberty Mutual is not obligated to provide insurance coverage for liabilities arising out of a subsidiary’s activities prior to the date on which that subsidiary became a named insured of UTC.
5. Conclusion. Because all deliveries by Essex, Otis and Inmont to the Sante Fe Springs Site were made prior to their acquisition by UTC, there is no insurance coverage, under the Liberty Mutual policies, for environmental contamination of this site. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Verona Wellfield Site, Battle Creek, MI 82-103
The Verona Wellfield Site is located in Battle Creek, Michigan.
1. Site Operations. The Verona Wellfield is the primary source of drinking water for the 53,000 residents of the City of Battle Creek and several surrounding communities. Affidavit of Gary S. Kull, Ex. 63, “Wellfields,” Tab A, “EPA Record of Decision,” pg. 1. The Grand Trunk Western Railroad (GTWRR), and the Thomas Solvent Company are located in the vicinity of the Verona Wellfield and have been identified as the sources of the Verona Wellfield’s contamination. Id. at 2-4.
*223 The Thomas Solvent Company operated two facilities from 1964 to 1981. Id. at pg. 3. These facilities were named the Thomas Solvent Raymond Road facility and the Annex facility. Id. Both were operated as solvent collection and distribution facilities. Id. At the Thomas Solvent Raymond Road facility, twenty-one underground storage tanks, ranging in size from 4,000 to 15,000 gallons, were used to store solvents. Id. at 3.Investigations at the Raymond Road facility revealed gross contamination of the soils and groundwater resulting from leaks in the underground storage tanks, leaking drums and surface spills that occurred during operation. Id. In addition to contaminated soil and groundwater, a floating layer of nonaqueous phase liquid was discovered between the soil and the groundwater which was four feet deep at its thickest and was comprised of pure solvents and mineral spirits. Id.
The Thomas Solvent Annex operation consisted primarily of the unloading of solvents from railroad tank cars, but also served as a storage area for barrels of spent solvents. Id. In addition, the Annex contained two underground storage tanks, a 20,000-gallon above-ground tank, a loading dock for barrel storage and a solvent transfer area. Id. Contamination of the soil and groundwater at this site was apparently caused from leaking drums and surface spills that occurred during operations. Id. at 4.
The Grand Trunk Western Railroad yard is a railroad switching yard. Id. Also located on the grounds is a car repair and paint shop. Id. Solvents were used at this site for degreasing and cleaning. Id. Contamination at this site resulted when spent solvents were placed in a “drum pit,” a fifty-five — gallon drum buried in the soil, with holes for drainage cut in the sides and bottom. Id. Due to the extensive contamination at these sites, twenty-seven of the thirty drinking water supply wells of the Verona Wellfield were contaminated and closed. Id.
2. Time Period of Damage. The contamination at these sites began in the 1960s and continued until state and federal authorities intervened in the 1980s. Defendants’ Site Statements, 82-103.
3. UTC Involvement. Inmont and Essex, subsidiaries of UTC, shipped waste to these sites. Plaintiffs’ Site Statements, 82-103. Inmont shipped waste from 1971 through 1980. Id. The dates of shipments made by Essex are unknown. Id. On May 28, 1986, the United States filed suit against the Thomas Solvent Company and Grand Trunk Western Railroad for the contamination of the Verona Wellfield. Plaintiffs’ Second Amended Complaint, pg. 103, para. 385-88. On October 2, 1987, Grand Trunk Western Railroad filed an action for contribution against Inmont and Essex alleging that they are potentially responsible parties in connection with the contamination of the Verona Wellfield. Id.
4. No Sudden and Accidental Release. UTC submits the deposition testimony of several employees who all recount numerous instances in which hazardous substances were spilled at these sites while being pumped from tank cars to drums, from tank trucks to warehouse tanks, or where tanks overflowed after being overfilled with product. Affidavit of Peter A. Gutermann, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 74. UTC contends that these events are the sudden and accidental occurrences which caused the contamination of the Verona Wellfield. Id. Even assuming that the repeated spill of hazardous waste during transfer procedures can be considered “sudden and accidental,” UTC ignores the explicit findings of the EPA which recounts that the contamination at these sites was due to leaking drums, tanks, surface spills, and the dumping of solvents into a bottomless barrel. Affidavit of Gary S.Kull, Ex. 63 “Wellfields”, Tab A, “EPA Record of Decision.”
5. Pollution Exclusion. It is undisputed that Inmont shipped waste to this site from 1971to 1980. Plaintiffs’ Site Statements, Ex. 82-103. The exact dates of shipment to the site by Essex are unknown. However, Essex did not become a named insured of UTC until 1974, well after the 1970 implementation of the pollution exclusion clause into all relevant insurance policies. Since all relevant shipments from Inmont or Essex were made to these sites after 1970, the pollution exclusion clause applies and coverage only exists for the release of contaminants caused by a sudden and accidental occurrence. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the contamination of this site was due to accidental spills which occurred during transfer procedures. Liberty Mutual has set forth facts which indicate that the contamination of this site was due to leaking drums, tanks, surface spills, and the dumping of solvents into a bottomless barrel. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, both the Thomas Solvent Company and the Grand Trunk Western Railroad were in the business of handling hazardous substances. Yet, both engaged in haphazard disposal practices over a period of several years which resulted in widespread contamination. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the con *224 tamination of this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment is appropriate in favor of Liberty Mutual.
Inmont Plant, Belvidere, NJ 89-110
This site is an Inmont-owned paint manufacturing facility located in Belvidere, New Jersey.
1. Site Operations. Inmont purchased this site in 1973. Defendants’ Site Statements, 89-110. Prior to 1973, several different owners utilized the site for various industrial applications, including silk dyeing, gunpowder manufacturing and plastics manufacturing. Id. Inmont utilized hazardous substances at this site, including acetone, methyl ethyl ketone, toluene and methyl isobulyl ketone, in connection with their manufacturing operations at the site. Plaintiffs’ Site Statements, 89-110. In the early 1980s, UTC conducted several investigations of environmental contamination at the Belvidere plant. Affidavit of William H. McConaughy, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 79. UTC documented several spills which resulted in contamination. Id. One of these spills resulted in the contamination of the Delaware River. Id. A spill of fuel oil in the 1950s resulted in oil migrating in the direction of the North Stream. Id. On July 25, 1985, UTC entered into an Administrative Consent Order with the New Jersey Department of Environmental Protection (NJDEP) obligating UTC to remediate the environmental contamination at the Belvidere Plant. Id. Pursuant to the terms of the Administrative Order, UTC was required to submit a Cleanup Plan to the NJDEP for approval and to provide financial security guaranteeing performance of the Cleanup Plan. Id.
2. Time Period of Damage. This site has been used as a manufacturing facility since 1925.
3. UTC Involvement Inmont purchased this facility in 1973. Inmont was acquired by UTC in 1979 and became a named insured in November of 1980. In-mont, including the Belvidere Plant, were sold to the BASF Corporation in 1985.
4. No Damage to Third-Party Property. In its insurance policies, Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to a third party or destruction of a third party’s property which was accidentally caused. UTC does not allege that any third party has made a claim for damages with respect to the environmental contamination at this site. Here, all costs for which Inmont seeks coverage for are costs incurred in order to achieve compliance with New Jersey laws and regulations. Such costs do not constitute “damages” under the defendants’ policies.
5. Owned Property Exclusion. Any damage caused by the environmental contamination at this site is limited to the plaintiffs’ own property. The insurance agreement between the parties provides: “This policy does not apply to injury to or destruction of property owned by any named insured.”
6. No Suit. The relevant language of the insurance policies at issue provides that Liberty Mutual shall defend any suit against the insured alleging injury and seeking damages. Here, UTC entered into a Consent Order with the NJDEP in order to facilitate the sale of Inmont to BASF. The Consent Order requires Inmont to comply with New J ersey laws and regulations. There is no formal private or governmental action against inmont, and there is no government letter, coercive in nature, identifying Inmont as a potentially responsible party. See Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 694-95 (1990). The Consent Order between Inmont and the NJDEP does not constitute a “suit.”
7. No Pre-acquisition Coverage. Inmont was acquired by Carrier, Inc. in 1978. Carrier was acquired by UTC on July 6, 1979. Carrier did not become a named insured under the Liberty Mutual policies until November 1, 1980. UTC contends that several spills at the Belvidere Plant resulted in contamination. However, all of the spills documented by UTC occurred prior to the acquisition of Inmont in 1979. Affidavit of William H. McConaughy, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 79. As a matter of law, no policy in effect prior to UTC’s acquisition of Inmont provides coverage for liabilities arising out Inmont’s pre-acquisition activities.
8. Conclusion. UTC has failed to establish that they have been sued for any damage to the property of a third party emanating from the Belvidere Plant. Further, any contamination that has occurred at this site occurred prior to Inmont’s acquisition by UTC. Therefore, summary judgment in favor of Liberty Mutual is appropriate.
Inmont Plant, Boundbrook, NJ 91-112
The Bound Brook facility is located on a twenty-five — acre tract in Middlesex County, New Jersey.
1. Site Operations. The Bound Brook site has been operated as an industrial facility since approximately 1929. Affidavit of Gary S. Kull, Ex. 70, “Owned Sites,” Tab A, “Cleanup Plan, Former Inmont Facility,” pg. 1. From the early 1970s, the facility manufactured pigment dispersions. Id. at pg. 1-5. Paints and inks are made from pigment dispersions with the addition of solvents. Id. The production process utilized numerous hazardous substances and generated hazardous wastes. Id. Underground storage tanks are located on *225 the facility. These tanks contained hazardous substances including toluol, ethyl acetate, water and oil emulsions, fuel oil, butyl acetate, waste solvents and xylol. Id. In 1981, UTC discovered that the groundwater was contaminated 'with several of the same hazardous substances used in its operations. Id. In 1985, UTC sold Inmont to the BASF Corporation and in compliance with state requirements, UTC retained LAN Associates, Inc. to conduct an environmental study of the facility. Id. at 13; Affidavit of Brian J. Yeich, In Support of Plaintiffs’ Opposition to the Dismissal of the Non-New England Sites, Ex. 81, Tab B. “IAN Associates, Site Evaluation Submission.” This study revealed that numerous spills over a period of thirty years occurred at the Bound Brook facility. Id. In 1959, 6,000 gallons of dicyclopentadiene spilled from a rail car that was improperly sealed. Id. During the early years of operation, waste materials were disposed of in a hole on the site. Id. In the late 1960s approximately 10,000 gallons of liquid dicyclopentadiene were spilled from a rail car with a defective valve. Id. A 1979 inspection revealed that ground water on the site was contaminated by hazardous substances including dichlorethane, benzene, toluene, xylene and tetrachloroethane. Id. In 1981, a storage tank leak was discovered. Inmont estimated that 25 gallons of ethyl alcohol were lost. Id. In 1981, a rerouted freight train derailed on Inmont’s property and spilled 3,000 gallons of diesel fuel. Id. In February 1985, 1,000 gallons of ethyl acetate was released from another leaking tank. Id.
2. Tims Period of Damage. Contamination at this site began with a spill of dicyclopentadiene in 1959. Spills occurred on a fairly regular business through the 1980s.
3. UTC Involvement. Inmont operated this plant from 1936 to 1985. Plaintiffs’ Site Statements, 91-112. In 1985, UTC sold Inmont to the BASF Corporation. Defendants’ Site Statements, 91-112. On August 13, 1979, Inmont was served with Notice of Violation by the New Jersey Department of Environmental Protection. Id.
4. No Sudden and Accidental Release. In 1979, UTC began investigations into environmental contamination at the Bound Brook Site. Affidavit of Brian J. Yeich, In Support of Plaintiffs’ Opposition to the Dismissal of the Non-New England Sites, Ex. 81, Tab B. “LAN Associates, Site Evaluation Submission.” As a result of these investigations, environmental contamination was reported to the New Jersey Department of Environmental Protection. Id. In 1985, UTC sold In-mont to the BASF Corporation and in compliance with state requirements, retained IAN Associates, Inc. to conduct an environmental study of the facility. Affidavit of Gary S. Kull, Ex. 70, “Owned Sites,” Tab A, “Cleanup Plan, Former Inmont Facility.” at 13. This study revealed that numerous spills over a period of thirty years occurred at the Bound Brook facility. Id. In 1959, 6,000 gallons of dicyclopentadiene spilled from a rail car with a defective valve. Id. During the early years of operation, waste materials were disposed of in a hole on the site. Id. A 1979 inspection revealed that ground water on the site was contaminated by hazardous substances including dichloreth-ane, benzene, toluene, xylene and tetrachloroethane. Id. In 1981, a storage tank leak was discovered. In-mont estimated that 25 gallons of ethyl alcohol were lost. Id. In 1981, a rerouted freight train derailed on Inmont’s property and spilled 3,000 gallons of diesel fuel. Id. In February 1985, 1,000 gallons of ethyl acetate was released from another leaking tank. Id. On July 25, 1985, UTC entered into an Administrative Consent Order with the NJDEP obligating UTC to remediate the contamination at the Bound Brook plant. Plaintiffs’ Second Amended Complaint, pg. 112, para. 423-26 UTC contends that these events are the sudden and accidental occurrences which justify insurance coverage for the contamination of the Bound Brook Site.
5. Pollution Exclusion. This is an owned site. Inmont did not become a named insured of UTC until 1980. Therefore, all relevant insurance policies were in effect after the 1970 implementation of the pollution exclusion clause. To avoid the pollution exclusion clause, UTC must set forth facts which indicate that the contamination of this site was caused by a sudden and accidental event and not by long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that numerous accidental spills occurred at this site which caused contamination. The defendants have set forth facts which indicate that in addition to repeated spills, hazardous wastes were disposed of at this site, simply by being dumped into a hole. Once a substantial, non-sudden and non-accidental polluting event is established, the pollution exclusion clause cannot be avoided merely by showing that a single sudden and accidental event has occurred. Here, Inmont was in the business of handling hazardous substances. Yet, wastes were improperly disposed of and frequently spilled. These acts resulted in contamination. It is not beyond the long range expectations of UTC that hazardous substances stored in this manner could cause contamination. In light of these facts, it is unlikely that UTC will be able to produce sufficient evidence at trial to carry their burden of demonstrating that the contamination of this site was caused by a sudden and accidental event.
6. Conclusion. Because the release of contaminants at this site cannot be deemed to have been sudden and accidental, there is no insurance coverage under the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. *226 Therefore, partial summary judgment in favor of Liberty Mutual is appropriate.
HSC (Spectrol) Plant, City of Industry, CA 93-113
This is a manufacturing facility, located in the City of Industry, California.
1. Site Operations. Operations at this facility included the manufacture of metal coils and the assembly of electronic sub-assemblies. Plaintiffs’ Site Statements, 93-113. Spectrol first began operations at this facility in 1966. Operations ceased in 1989. Plaintiffs’ Second Amended Complaint, pg. 113, para. 430. Hazardous substances, including solvents, oils, varnish and glue were used in the manufacturing process. Id. at para. 431. Subsurface ground water and soil analysis were taken at this site and the California Regional Water Quality Control Board determined that further investigations and assessments needed to be done. Plaintiffs’ Site Statements, 93-113; Defendants’ Motion for Summary Judgment, Ex. 26.
2. Time Period of Damage. Hazardous substances were used at this facility throughout its period of operations.
3. UTC Involvement. Hamilton Standard Controls, a subsidiary of UTC, operated this manufacturing facility from 1966 to 1989. Plaintiffs’ Site Statements, 93-113.
4. No Damage to Third-Party Property. In its insurance policies, Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to a third party or destruction of a third party’s property which was accidentally caused. Here, UTC does not allege that any third party has made a claim for damages with respect to the environmental contamination at this site.
5. Owned Property Exclusion. Any damage caused by the environmental contamination at this site is limited to the UTC’s own property. The insurance agreement between the parties provides: “This policy does not apply to injury to or destruction of property owned by any named insured.”
6. No Suit. The relevant language of the insurance policies at issue provides that Liberty Mutual shall defend any suit against the insured alleging injury and seeking damages. There is no formal private or governmental action against HSC and there is no government letter, coercive in nature, identifying HSC as a potentially responsible party. See Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 694-95 (1990).
7. Conclusion. In the absence of a suit, summary judgment is appropriate in favor of Liberty Mutual.
Inmont Plant, Clifton, NJ 94-114
Inmont owns and operates a corporate headquarters and research laboratory at this facility located in Clifton, New Jersey.
1. Site Operation. Inmont operated this site from approximately 1964 to 1985. Defendants’ Motion for Summary Judgment, Ex. 47. During these years, Inmont utilized hazardous substances such as cadmium, antimony and mercury in connection with research activities at this site. Defendants’ Site Statements, 94-114. In 1985, UTC sold Inmont to the BASF Corporation. Id. The sale included the Clifton plant. Id. Upon execution of the purchase agreement, UTC was obligated to notify the New Jersey Department of Environmental Protection (NJDEP) of its intent to sell the property, to supply information concerning the facility and to cleanup any hazardous waste located at the facility. Id. Contamination was discovered by In-mont and reported to the NJDEP. On July 25, 1985, UTC entered into an Administrative Consent Order with the NJDEP obligating UTC to remediate contamination at the Clifton facility. Plaintiffs’ Second Amended Complaint, pg. 114 para. 434-37
2. Time Period of Damage. Hazardous substances were used at this site throughout its years of operation.
3. UTC Involvement Inmont, a subsidiary of UTC, operated this manufacturing facility from 1964 to 1985.
4. No Damage to Third-Party Property. In its insurance policies, Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to a third party or destruction of a third party’s property which was accidentally caused. Here, UTC does not allege that any third party has made a claim for damages with respect to the environmental contamination at this site.
5. Owned Property Exclusion. Any damage caused by the environmental contamination at this site is limited to UTC’s own property. The insurance agreement between the parties provides: “This policy does not apply to injury to or destruction of property owned by any named insured.”
6. No Suit. The relevant language of the insurance policies at issue provides that Liberty Mutual shall defend any suit against the insured alleging injury and seeking damages. There is no formal private or governmental action against Inmont and there is no government letter, coercive in nature, identifying Inmont as a potentially responsible party. See Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 694-95 (1990). The administrative consent order entered into between the parties is not the equivalent of a lawsuit.
7. Conclusion. In the absence of a suit, summary judgment is appropriate for the defendants.
*227 Inmont Plant, Hawthorne, NJ 101-120
Inmont owned and operated this colorant manufacturing plant located in Hawthorne, New Jersey.
1. Site Operations. Inmont operated this plant from 1950 to 1985 when it was sold to the BASF Corporation. Plaintiffs’ Site Statements, 101-120. The plant was used to manufacture textile dyes and pigments. Affidavit of Carol A. Kelly, Ex. 13. Inmont’s manufacturing operations at this site utilized hazardous substances including toluene, xylene, and barium. Plaintiffs’ Second Amended Complaint, pg. 120, para 461. In March of 1982, as a result of UTC investigations, environmental contamination was discovered at the Hawthorne Plant and was reported to the New Jersey Department of Environmental Protection. Affidavit of Troy J. Charlton, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 86. Contamination at this site was caused by two chemical explosions, four oil spills and one leaking underground storage tank. Id. In 1985, UTC entered into a Consent Order with the New Jersey Department of Environmental Protection (NJDEP) whereby Inmont was obligated to comply with applicable New Jersey laws. Affidavit of Troy J. Charlton, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 86, Tab A, “EPA Administrative Consent Order.” UTC asserts that on March 17, 1988, a group of private citizens filed suit against UTC, Inmont and others claiming that they suffered bodily injury and property damage as a result of Inmont’s handling of hazardous substances at the Hawthorne Plant. Plaintiffs’ Site Statements, 101-120.
2. Time Period of Damage. This site has operated as a manufacturing facility since 1950. Numerous explosions, spills and leaks occurred at this site during the 1970s and 1980s.
3. UTC Involvement Inmont operated a manufacturing facility at this plant from 1950 to 1985.
4. Summary Judgment Regarding This Site is Inappropriate. UTC contends that a third-party suit has been filed against UTC for damage resulting from the contamination of this site. UTC however, fails to provide the court with a copy of any complaint filed, or with any information regarding the outcome of this lawsuit. However, until information is brought forth concerning this lawsuit, and any damages awarded, summary judgment is inappropriate.
5. Conclusion. For this reason, Liberty Mutual’s motion for summary judgment in regards to this site is denied.
Inmont Plant, Lodi, NJ 103-122
The Lodi Plant was operated by Inmont as an ink manufacturing facility.
1.Site Operations. Inmont operated the Lodi Plant from 1950 to August 1985. Plaintiffs’ Site Statements, 103-122. The Lodi Plant produced printing inks. Id. Hazardous substances used, stored or generated at this site including petroleum distillate, hydrocarbons, hexane, toluene, benzene and xylene. Id. UTC contends that explosions, fires and a series of spills during the 1970s and 1980s resulted in the contamination at this site. Affidavit of William H. McConaughy, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 89. On July 25, 1985, UTC entered into an Administrative Consent Order with the New Jersey Department of Environmental Protection obligating UTC to remediate the contamination at the Lodi Plant. Id. at Tab A, “Administrative Consent Order.”
2. Time Period of Damage. Inmont began operations at this facility in 1950. A series of spills and fires in the 1970s and 1980s resulted in contamination.
3. UTC Involvement. Inmont, a subsidiary of UTC, operated a manufacturing plant at this site from 1950 to 1985.
4. No Damage to Third-Party Property. In its insurance policies, Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to a third party or destruction of a third party’s property which was accidentally caused. Here, UTC does not allege that any third party has made a claim for damages with respect to the environmental contamination at this site.
5. Owned Property Exclusion. Any damage caused by the environmental contamination at this site is limited to the Inmont plant. The insurance agreement between the parties provides: “This policy does not apply to injury to or destruction of property owned by any named insured.” Here, UTC fails to submit evidence to suggest that any contamination at the Lodi Plant has migrated off-site or has been detected in the groundwater. Therefore, all damage is limited to UTC’s own property and is not covered.
6. No Suit. The relevant language of the insurance policies at issue provides that Liberty Mutual shall defend any suit against the insured alleging injury and seeking damages. There is no formal private or governmental action against HSC and there is no government letter, coercive in nature, identifying HSC as a potentially responsible party. See Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 694-95 (1990). The administrative consent order entered into between the parties is not the equivalent of a lawsuit.
7. Conclusion. In the absence of a suit, summary judgment is appropriate in favor of Liberty Mutual.
CSD Coyote Plant, San Jose, CA 109-127
Chemical Systems Division (CSD), a subsidiary of UTC, operates this manufacturing facility located on a five-thousand — acre site in San Jose, California.
1. Site Operations. CSD develops, manufactures, and tests solid rocket fuels and rocket motors at this site. Plaintiffs’ Site Statements, 109-127. CSD first began operations at the Coyote Plant in the late 1950s *228 and continues to the present. Id. Hazardous substances used, stored and generated at this site include polybutadiene, acrylonitrile, polymere, ammonium, perchlorate, aluminum powder, epoxies, paints and insulating materials. Id. The waste management facilities at the site include hazardous waste surface im-poundments, tanks, burn pits, sumps, waste-water treatment plant with storage pond and spray field, and drum storage facilities. Affidavit of Gary S. Kull, Ex. 66. A groundwater investigation by the California Regional Water Qualify Control Board (CRWQCB) on December 21, 1988, revealed that contaminant plumes originating from many potential sources, including historic locations of drummed storage of various solvents, and two surface impoundments. Id.
2. Time Period of Damage. This facility began operations in the late 1950s.
3. UTC Involvement. CSD, a subsidiary of UTC, has operated this manufacturing facility since the 1950s. On December 2, 1980, the CRWQCB issued waste discharge requirements to CSD. Plaintiffs’ Site Statements, 109-127. On January 18, 1989, the CRWQCB issued another order with further directives. Id. On February 24, 1989, the EPA issued an administrative order requiring CSD to perform a facility investigation report and a corrective measures study for the Coyote Plant. Plaintiffs’ Site Statements, 109-127; Affidavit of Gary S. Kull, Ex. 66, Tab, B.
4. No Damage to Third-Party Property. In its policies Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to or destruction of property accidentally caused. Damages include the costs of environmental cleanup incurred in response to demands of government agencies. Hazen Paper Co. v. United States Fidelity & Guar. Co., 407 Mass. 689 (1990). However, the Supreme Judicial Court in Hazen distinguished response costs incurred for extant pollution, for which there was coverage, from costs incurred to prevent future pollution. Id. at 698. Damages do not include 1) the costs of complying with a government order directed to damage prevention, or 2) the costs of complying with the law when there has been no properly damage. Id. Here, UTC contends they are entitled to indemnification for costs incurred to investigate, monitor and contain the contamination present at the site. Plaintiffs’ Second Amended Complaint, pg. 127-28, para. 496-01. UTC is not entitled to indemnification because all costs expended concerned the costs of preventing future contamination and compliance with existing law.
5. Owned Property Exclusion. Any damage caused by the environmental contamination at this site is limited to the CSD Coyote plant. The insurance agreement between the parties provides: “This policy does not apply to injury to or destruction of property owned by any named insured.” Here, UTC fails to submit evidence to suggest that any contamination at the CSD plant has migrated off-site or has been detected in the groundwater. Therefore, all damage is limited to UTC’s own property and is not covered.
6. No Suit. UTC contends that the CRWQCG waste discharge requirements and the EPA Order requiring corrective action is sufficient to constitute a suit. However, Massachusetts law is clear that government action can only constitute a “suit" when the consequences of the action are “substantially equivalent to the commencement of a lawsuit.” Hazen, 407 Mass. at 696. In Hazen, the court found that the PRP letter met the requirements of a suit because the EPA demanded immediate commitment to complete cleanup measures, and reimbursement for all costs incurred in contamination remediation. Further, the PRP letter threatened criminal penalties and fines if its demands were not complied with. Hazen, 407 Mass. at 694. Here, neither the letters from the CRWQCG or the EPA are sufficient to constitute a suit under the Hazen standard.
7. Conclusion. In the absence of a suit, summary judgment is appropriate in favor of Liberty Mutual.
CSD Plant, Sunnyvale, CA 114-132
Chemical Systems Division (CSD), a subsidiary of UTC, owned and operated an administrative office and a research and development facility at this site in Sunnyvale, California.
1. Site Operations. This site was in operation from 1963 to 1983. Plaintiffs’ Site Statements, 114-132. Facilities at this site included a research laboratory for rocket systems and a machine shop located on-site that used solvents. Affidavit of Gary S. Kull, Ex. 67, Tab A. CSD utilized hazardous substances in its activities at the plant, including trichloroethylene (TCE), trichloroethane, xylene and freon. Plaintiffs’ Site Statements, 114-132. UTC asserts that a lawsuit relating to CSD’s involvement with this site was filed in January of 1990. Id.
2. Time Period of Damage. Hazardous substances were handled at this facility throughout its years of operation.
3. UTC Involvement. CSD, a subsidiary of UTC, operated this facility from 1963 to 1983.
4. Summary Judgment Regarding This Site is Inappropriate. UTC contends that a third-party suit has been filed against them for damage resulting from the contamination of this site. Plaintiffs’ Site Statements, 114-132. UTC however, fails to provide the court with a copy of any complaint filed, or with any information regarding the outcome of this lawsuit. If a lawsuit has been filed regarding the contamination of this site, it is possible that the contamination pre-dates the 1970 implementation of the pollution exclusion clause into all relevant insurance policies. Until information is brought forth concerning the cause of the contamination of this site, the lawsuit filed, and any damages awarded, summary judgment is inappropriate.
*229 5.Conclusion. For these reasons Liberty Mutual’s motion for summary judgment in regards to this site is denied.
Pratt & Whitney Plant, West Palm Beach, FL 117-135
This facility is owned by Pratt & Whitney, a subsidiary of UTC, and is located on a seven-thousand — acre site in West Palm Beach, Florida.
1. Site Operations. This Pratt & Whitney site serves as a manufacturing and testing facility for government and commercial aircraft engines. Affidavit of Gary S. Kull, Ex. 75, “Owned Sites.” From 1958 until 1972, solid and liquid wastes were disposed of at this site in a series of excavated trenches. Defendants’ Motion for Summary Judgment, Ex. 82. In 1972, the state of Florida prohibited the use of trench type landfills. Affidavit of Gary S. Kull, Ex. 75, “Owned Sites.” On August 16, 1984 and April 26, 1985, Pratt & Whitney notified the Florida Department of Environmental Resources of soil and groundwater contamination at the site. Plaintiffs’ Site Statements, 117-135. UTC and environmental authorities then entered into a series of Consent Agreements (the Agreements). Affidavit of Gary S. Kull, Ex. 75, “Owned Sites,” Tab A, B. C. The Agreements stated that the landfill trenches had contaminated the site with volatile organic compounds (VOC’s). Id. The Agreements also stated that in 1981, Pratt & Whitney discovered the presence of PCB’s in canal waters at the site and in 1984, waste oil was discovered leaking from an underground storage tank. Id.
2. Time Period of Damage. Hazardous wastes were handled at this site from 1957 to the present.
3. UTC Involvement. Pratt & Whitney, a subsidiary of UTC, operated a manufacturing facility at this site.
4. No Damage to Third-Party Property. In its insurance policies, Liberty Mutual agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to a third party or destruction of a third party’s property which was accidentally caused. Here, UTC does not allege that any third party has made a claim for damages with respect to the environmental contamination at this site.
5. Owned Property Exclusion. This is an owned site. The insurance at issue here is third-party coverage. Owned property is not covered. The owned property exclusion will not bar coverage for cleanup costs undertaken on UTC’s property where there is an actual or threatened damage to third-party property, including the groundwater beneath the insured’s property. Here, UTC has failed to present any evidence that contamination at this site has migrated off-site or has been detected in the groundwater.
6. No Suit. UTC alleges that insurance coverage should be provided for the costs incurred, costs to investigate, monitor, and contain the contamination present at the plant. Plaintiffs’ Second Amended Complaint, pg. 135, para. 531-34. The relevant language of the insurance policies at issue provides that the defendant shall defend any suit against the insured alleging injury and seeking damages. Here, there is no allegation that any third party, the USEPA, or Florida Department of Environmental Resources has brought suit against UTC. In addition, no evidence has been presented to indicate that any contamination has migrated off-site or that contamination threatens to migrate off-site. Any damages that might have occurred were limited to Pratt & Whitney’s property and the owned property exclusion bars coverage for plaintiffs’ claim at this site. See Hazen Paper Co. v. United States Fidelity & Guar. Co., 407 Mass. 689, 694-95 (1990).
7.Conclusion. In the absence of a suit or any damage to a third party, summary judgment in favor of Liberty Mutual is appropriate.
UTA Plant Zanesville, OH 119-137
United Technologies Automotive owns and operates this manufacturing facility located in Zanesville, Ohio.
1. Site Operations. The Zanesville plant manufactures electrical switch parts and other switches used in the automobile industry. Plaintiffs’ Site Statements, 119-137. UTA utilized hazardous substances in their operations. Plaintiffs’ Second Amended Complaint, pg. 137-38, para. 539-41. The UTA facility is located approximately five hundred feet from a wellfield that provides drinking water to the City of Zanesville. Affidavit of Gary S. Kull, Ex. 82, “Owned Sites.” In June of 1981, the EPA conducted routine water sampling in Zanesville and found traces of trichloroethylene (TCE) and similar compounds in three of the City’s wells. Plaintiffs’ Second Amended Complaint, pg. 138, para. 540-41. In November of 1981, the wells were again sampled and even higher traces of TCE were found. Id. In December of 1981, as a result of an investigation in cooperation with the City of Zanesville, UTA discovered that the source of the contamination was drums containing hazardous waste material which had been dumped into an abandoned well on UTA’s property. Affidavit of Gary S. Kull, Ex. 82, “Owned Sites," Tab A, “EPA Administrative Order By Consent.” Gerald Sturtz, a UTA Safety and Environmental Coordinator, states that the drums filled with hazardous waste were deposited in the well in 1973, “as a means of filling the well.” Affidavit of Gerald Sturtz, In Support of Plaintiffs’ Opposition to Dismissal of Non-New England Sites, Ex. 94.
2. Time Period of Damage. Operations at this facility began in 1962. In 1973, employees of UTA dumped over one hundred drums of waste into an abandoned well. The deterioration of these drums caused the contamination of the Zanesville Wellfield which was discovered in 1981.
*230 3. UTC Involvement. Essex purchased the UTA facility in 1962. UTC acquired Essex in 1974. Plaintiffs’ Site Statements, 119-137. On August 3, 1988, UTA entered into an administrative order by consent with the USEPA and the Ohio Environmental Protection Agency in connection with the groundwater contamination at the City of Zanesville’s drinking wells. Id. This order notified UTA as the only potentially responsible party in connection with contamination at the site. Id.
4. No Sudden and Accidental Release. UTC contends that the rupture of the drums placed in the abandoned well and a 1985 crack in a treatment tank and the release of five hundred gallons of electroplating bath solution are the sudden and accidental events which justify insurance coverage. Affidavit of James S.Kovitz, In Support of Plaintiffs’ Opposition to Dismissal of the Non-New England Sites, Ex. 95. UTC ignores the fact that one hundred drums of hazardous waste was intentionally dumped into an abandoned well on the UTA site. Nine years later, the contamination of the Zanesville Wellfield resulted. Such an intentional act cannot be considered “accidental” within the meaning of the pollution exclusion clause.
5. Pollution Exclusion. This is an owned site. Essex began operations here in 1962. Plaintiffs’ Site Statements, 119-137. Essex became a named insured of UTC in 1974. Therefore, all relevant insurance policies were in effect after the 1970 implementation of the pollution exclusion clause. Liberty Mutual contends that the contamination at this site was caused by pollution-prone operating practices. Faced with a showing that coverage is precluded by the pollution exclusion clause, UTC has the burden of producing countervailing materials showing that the polluting event was sudden and accidental and was not due to not long-term, gradual pollution which occurred as a part of daily business operations.
UTC contends that the sudden and accidental rupture of the drums in the well and a spill of electroplating bath solution from a storage tank caused the contamination at this site. The defendants have set forth facts which indicate that the contamination of the Zanesville Wellfield was caused by the intentional dumping of one hundred drums of hazardous waste in an abandoned well located on UTA properly. Once a substantial non-sudden and non-accidental polluting event is established, the pollution exclusion cannot be avoided merely by a showing that a single sudden and accidental event has occurred. Here, UTA operated a business that utilized hazardous substances. These substances intentionally were dumped into a well. The Zanesville Wellfield was located only 500 feet from the UTA property. Damage resulting from purposeful conduct cannot be considered “accidental.” Lumbermens Mut. v. Belleville Industries, 938 F.2d 1423, 1429 (1st Cir. 1991), quoting United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir. 1988). It is not beyond the long range, reasonable expectations of UTA that the manner in which these wastes were stored could cause contamination. Based upon these facts, it is unlikely that the plaintiffs will be able to produce sufficient evidence at trial to carry the burden of demonstrating that the contamination at this site was caused by a sudden and accidental event.
6.Conclusion. Because the release of contaminants at this site was due to long-term pollution-prone operations and cannot be deemed to have been sudden and accidental, there is no insurance coverage under the main body of the Liberty Mutual policies for the environmental contamination at this site. A third-party claim under Endorsement 4 for gradual pollution might be considered if all other terms and conditions of the policies are met. Therefore, partial summary judgment is appropriate in favor of Liberty Mutual.
ORDER
Accordingly, it is ORDERED that entry be made relative to the defendants’ Motion for Summary Judgment on the thirty-nine (39) Non-New England sites identified in the Second Amended Complaint as follows:
1. Granting summary judgment in favor of the defendants as set forth in the Conclusion paragraph of the following sites:
1) American Chemical Services, Griffith, IN 1-29
2) Bio-Ecology, Grand Prairie, TX 4-32
3) Bluff Road Site, Columbia, SC 5-33
4) Chemical Control Site, Elizabeth, NJ 11-39
5) Duane Marine Site, Perth Amboy, NJ 23-49
6) Jadco-Hughes Site, Belmont, NC 34-59
7) Maryland Sand & Gravel, Elkton, MD 44-68
8) Metamora Landfill, Metamora, MI 47-71
9) Poer Farm Site, Hancock Ct., IN 58-81
10) Rock Hill Chemical Site, Rock Hill, SC 63-85
11) Royal Hardage Site, Criner, OK 67-89
12) Sante Fe Springs I Site, Sante Fe Springs, CA 71-92
13) Seymour Recycling Site, Seymour, IN 76-97
14) Inmont Plant, Belvidere, NJ 89-110
15) HSC (Spectrol) Plant, Ciiy of Industry, CA 93-113
16) Inmont Plant, Clifton, NJ 94-114
17) Inmont Plant, Lodi, NJ 103-122
18) CSD Coyote Plant, San Jose, CA 109-127
19) Pratt & Whitney Plant, West Palm Beach, FL 117-135
2. Granting summary judgment or partial summary judgment in favor of tire defendants, as set forth in the Conclusion paragraphs of the following sites:
*231 20) Bragg Site, Marion, IN 6-34
21) Butler Mine Tunnel, Pittstown, PA 7-35
22) ChemDyne, Hamilton, OH 10-38
23) Distler Farm and Brickyard, West Point & Jefferson Ct., KY 21-42
24) Enviro-Chem, Zionsville, IN 28-54
25) Fisher Calo Chemical Site, Kingsbury, IN 29-55
26) Frink’s Industrial Waste Site, Winnebago Ct., IL 31-57
27) I.J. Recycling Site, Fort Wayne, IN 33-58
28) Kin-Buc Landfill, Edison Township, NJ 37-61
29) Liquid Disposal Site, Shelby Township, MI 40-65
30) Maxey Flats Nuclear Disposal Site, Fleming Ct., KY 45-69
31) Northside Sanitary Landfill, Zionsville, IN 54-78
32) Quanta Resources Site, Syracuse, NY 60-83
33) Saad Waste Oil, Nashville, TN 68-90
34) Verona Wellfield Site, Battle Creek, MI 82-103
35) Inmont Plant, Boundbrook, NJ 91-112
36) UTA Plant, Zanesville, OH 119-137
3. Denying summary judgment as to the following sites:
37) Dreyfus Street, Columbia, SC 22-49
38) Inmont Plant, Hawthorne, NJ 101-120
39) CSD Plant, Sunnyvale, CA 114-132

 United Technologies Corporation, and others v. Liberty Mutual Insurance Company, and others, 1 Mass. L. Rptr. No. 5, 91 (October 11, 1993).

 Legal issues examined included: the definition of a suit; the determination of damages; the owned properly exclusion; the pollution exclusion clause; what constitutes a sudden and accidental release; the duly to defend; the trigger of coverage and the deemer clause; and principles of summary judgment.

 Mass.R.Civ.P. 56(f) is analogous to its federal counterpart.